## Case No. 17,412.

### The WENONAH.

[1 Hask. 606;[1] 22 Int. Rev. Rec. 49.]

District Court, D. Maine. Dec., 1875.

SEAMEN'S WAGES — DISCHARGE IN FOREIGN PORT —LOSS OF SHIP BY UNSEAWORTHI- NESS—PENALTIES.

1. American seamen, discharged in a for- eign port on loss of the vessel from unseawor- thiness existing at the inception of the voyage, may recover under Rev. St. §§ 4582, 4583, from the owners three months' extra wages.

[Cited in Brown v. Chandler, Case No. 1,- 998.] .

2. They cannot recover the penalty provided by Rev. St. § 4529, for the non-payment of wages then due them, when the net proceeds from the sale of the vessel are insufficient to pay the officers and crew, and it does not ap- pear that the master could have raised a suf- ficient sum for the purpose.

In admiralty. Libel in personam by Ameri- can seamen discharged in a foreign port on loss of the vessel to recover wages and three months' extra wages under Rev. St. §§ 4582, 4583, and the damages for non-payment of one fourth of the wages then due them provid- ed by Rev. St. § 4529, against the owners of the vessel, who denied by answer all liability in the premises. The cause was heard upon libel, answer and proofs.

Charles E. Clifford and William H. Clifford, for libellants.

Sewall C. Strout and Hanno W. Page, for respondents.

FOX, District Judge. This libel is promot- ed by the mate and steward of this vessel, a brigantine of 235 tons, against her owners to recover a balance of wages, and also three months' extra wages, allowed by the acts of con- gress, the vessel having been sold at Nassau, N. P., and her crew there discharged. The libel- lants, in August last, shipped at this port, on board this vessel, for a voyage to the Kenne- bec river for a cargo of ice, thence to Charles- ton, S. C., and thence where freight might offer. The vessel sailed on this voyage, de- livered her cargo in safety, and proceeded to Darien, where she loaded for Philadelphia with pine lumber, both on and under deck. She reached Hatteras, and when about fifteen miles from that light, the weather became somewhat heavy, with more sea than usual, which caused the vessel to leak badly in her upper works. The most of her forward sails were split and torn, and the mainsail was in that state, that the master did not deem it prudent to hoist it, it being very much worn; the mainmast head was rotten at the hounds. Under these circumstances, the vessel was making so much water, that all that remained for the master was to run off before the wind and throw over his deck-load, which was done. At the end of three days he found himself about five hundred miles from any port, with

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

his leak then under control, as by clearing his deck, he was able to caulk some of the worst leaks about his water ways. He then concluded to run for Nassau, where she ar- rived eleven days afterwards. Surveyors were called by the consul, and they reported the condition in which they found the vessel, and that it would cost over £500 for repairs, which they could not recommend to be made. A copy of the report was received by the man- aging owner, and he thereupon consigned the vessel to Darling & Co., with instructions to sell her, which they did at public auction, the gross amount of sales being £80, the balance of which sum, after deducting expenses and port charges, was paid to the American consul and by him distributed among the officers and crew, the latter being sent by the consul to Charleston, from whence they came to this port and instituted this libel.

By section 4525, Rev. St. U. S., the right of the crew to wages is no longer dependent on the earning of freight by the ship, and in case the vessel is lost the seamen are entitled to their wages to the time of the loss, if they have exerted themselves to the utmost for the saving of the ship and her cargo. No serious question therefore arises upon this branch of the case, and the libellants are clearly entitled to recover from the owners, the full amount of their wages up to the time of their dis- charge.

By sections 4582, 4583, Rev. St., it is further provided "that whenever a vessel belonging to a citizen of the United States is sold in a for- eign country and her company discharged, or when a seaman, a citizen of the United States, is, with his own consent, discharged in a for- eign country, it shall be the duty of the mas- ter to produce to the consul or officer the cer- tified list of the ship's company and to pay such consul or officer for every seaman so discharged, designated on such list as a citizen of the Unit- ed States, three months' pay over and above the wages which may then be due to such seaman. No payment of extra wages shall be required, upon the discharge of any seaman in cases where vessels are wrecked or stranded or con- demned as unfit for service."

The controversy here is as to the right of the libellants to recover the extra wages provided for by these sections. This vessel, by the report of the surveyors, was condemned as unfit for service. Such is the legal effect of their find- ings, and the case, therefore, is within the let- ter of the exception. But it is claimed, in be- half of the libellants, that the cause of her con- demnation was not on account of fortuitous in- juries occasioned to her by the perils of the sea on her voyage, but that it was entirely by reason of the unseaworthy condition of the ves- sel at the inception of the voyage, and well known to her master and owners. The survey states, that the vessel was not then leaking badly, as she was pumped out in four and one half minutes; "that on examination we found the mainmast head decayed and sprung at the hounds, main-topmast backstays knotted and

spliced in several places, mainsail worn out, foresail, both topsails, main-staysail and jibs old and much patched, lower topsail-yard sprung and decayed, foretop-gallant backstay stranded, two fore-chain bolts, port side, drawn and loose, deck-ends forward very open, stanchions decayed in covering-boards and at the back, top sides decayed in places; in the hold the sides were wet by extensive leaking from waterway seams, and round the stanchions iron fastenings much corroded, knees gouged in a few places. * * * In order to make the vessel seaworthy, it will be necessary to thoroughly overhaul the top sides, when we fear it will be found necessary to put in several new planks, the most of the stanchions will have to be renewed, then re-bulwarked, thoroughly caulked from the light water line, or probably all over, chain plates refastened, new mainmast, new topsail-yard, a complete set of sails, top-gallant sail and royal gaff-topsail excepted, about two coils of rope to reeve off running gear. We estimate that the outlay for the above necessary repairs and supplies will exceed £500 and therefore cannot recommend them." The court cannot but approve of the cautious language of the surveyors in their statement as to the cost of such repairs, as no doubt is entertained that if they had been made at that port, as demanded by the survey, the owners would have found to their regret that they were much in excess of £500.

The report of the surveyors clearly establishes that these repairs were called for by reason of the age and decay of the vessel and her apparel and furniture, and were not, in any material respect, occasioned by any extraordinary perils of the sea to which she had been subjected on the voyage; that she was in fact unseaworthy in very many particulars when she began this voyage, and was not in a suitable condition to undergo the usual perils to be expected from such an enterprise. In almost every instance specified by the surveyors, the defect was from old age, decay, ordinary wear and tear, and not from extraordinary disasters; it was the natural decay which caused her to be in this miserable condition, and if she had been a new vessel, none of these repairs, to any considerable amount, would have been called for. Other testimony in the cause fully sustains the findings of the surveyors in these particulars, and in some matters establishes a worse condition of things than is set forth in their report. It does not appear that they had examined with much care her hull so as to be fully informed as to the extent of the decay as to her top-timbers. One of the owners resided at Gorham, but the managing owner lived at Richmond, in this state, and it is but just to state that he does not appear to have had much experience with shipping. He was, at one time, an owner of a moiety of this vessel, and afterwards disposed of it, but again the past summer became interested in her by a purchase of one half for one thousand dollars. She was then nineteen or twenty years old, was built on the Penobscot river, and had been employed in coasting and the West India trade. It is not shown that any extensive repairs had ever been put upon her since she was launched. Previous to sailing on this voyage she was taken on to the railway, her copper stripped, and her bottom caulked and painted but not sheathed; her upper works had been caulked the year before. The managing owner says he gave directions to the carpenter to make such other repairs as he found necessary, but it does not appear that any were made. $1,000 to $1,200 were then expended upon her. The master states, that he understood she was for sale, and he with some friends, entertained an idea of buying her, and therefore, while she was on the ways, he bored her in forty-two places, nineteen proved sound, the balance were more or less rotten and tender, and he concluded not to purchase, but he did not inform the owner of his discoveries as to her situation; that he did inform him about the mainmast-head, and the owner had it examined by a spar maker, who reported, as the master states, that it had better be spliced, or a new mast had; but the master thought it would answer for this trip, and that was the opinion of the spar maker as the owner testifies. The master also testifies that he informed the owner that a new mainsail was necessary, and he agreed to procure one when the vessel was in the Kennebec river, as he could get it made cheaper there than at Portland; but none was obtained, for the reason, as the owner alleged, that a brother of the sail maker was dead. From the master's testimony I gather, that while he condemned the mainsail as unseaworthy, he was of opinion that her forward sails would answer for the proposed voyage, but that they were old, worn and patched, and could not stand much heavy weather. From all the testimony, I can draw no other conclusion than that the vessel was not in a seaworthy condition at the inception of the voyage, and that such unseaworthiness was the real moving cause of her condemnation at Nassau, as unfit for service.

In Couch v. Steel, 3 El. & Bl. 402, it was determined in the king's bench that by the law of England, a warranty of the seaworthiness of the ship is not implied from the relation of ship owner and seaman. But such, I think, is not the law in this country, and in my opinion, most clearly ought not to be of any country interested in commerce. In Dixon v. The Cyrus [Case No. 3,930], Judge Peters says: "Law and reason will imply sundry engagements of the captain to the mariners. First. That at the commencement of the voyage the ship shall be found seaworthy." 2 Pars. Shipp. & Adm. 78; Hoyt v. Wildfire, 3 Johns. 518; Hindman v. Shaw [Case No. 6,514]; Savary v. Clements, 8 Gray, 155,—all maintain the same doctrine.

Although upon the principles of the maritime law, the seaman was not entitled to wages if no freight was earned, yet it has been repeatedly held, that if the failure to earn freight was occasioned by the fault or negligence of the master or owner, they were accountable to the crew for their wages. In 1808, Hoyt v. Wildfire above cited, Kent, C. J., said: "It is just, as well as agreeable to

the maritime law, to distinguish between the cases in which the services of the seamen have not been rendered, in consequence of the perils of the sea, and in which they have not been rendered by reason of the act of the master or owner. * * * A voyage, lost by the fraud or misconduct of the master, and that so palpable as not to be denied, is not within the reason of the maxim, that freight is the mother of wages." Hill v. Murray [Case No. 6,495].

In Hindman v. Shaw [supra], Judge Peters says: "In some cases there is a distinction between a voyage broken up by the default of the owner, in sending a vessel to sea, found to have been unseaworthy in the outset, and one rendered so by unavoidable casualty. In the former case, the merchant is delinquent and subjects himself to all consequences."

Parsons, in his 2 Mar. Law, 592, says: "It has been said at common law, that if a ship be not seaworthy at the outset of the voyage, and be abandoned for that reason before freight is earned, no wages are due. But this rule would subject the seaman to lose his wages for his services for no fault of his own, but for that, which generally is in fact the fault of the owner, and may almost always be supposed to be so, and which the seaman could not, by labor or care have prevented, and we think it would not now be considered as law in admiralty, if any where." Lord Ellenborough in the case referred to by Parsons (Eaken v. Thom, 5 Esp. 6) did decide that the sailor could not recover wages under such circumstances; he at the same time admitted, that if the owner thus sent the ship to sea unseaworthy, the sailor might have a remedy by a special action on the case, a distinction without a difference, on such a state of facts when brought before a court of admiralty.

By section 3, c. 9, Act 1803 [2 Stat. 203], the master was required whenever a ship or vessel should be sold in a foreign country, and her company discharged, &c., to pay the three months' extra wages to the consul. The language of this section includes all sales, whether voluntary or involuntary, as no exception is made of any kind; but the decisions are uniform, that it should be restricted to voluntary sales, and that the law was not designed to reach cases of sales in invitum, when the sale or discharge is rendered unavoidable by an imperious and overruling necessity, or to use the language of Judge Ware in The Dawn [Case No. 3,666], "when the whole enterprise is brought to a premature conclusion by a fortuitous event, for which neither party is responsible." When the necessity for the sale was occasioned by the natural decay and wear of the ship from natural causes and which existed at the inception of the voyage, which were in no manner occasioned by any peril of the sea or disaster during the voyage, it was held to be within the provision of the act,

and the seamen were entitled to their extra wages. Such was the ruling of Betts, J., in 1832 in Wells v. Meldrun [Case No. 17,402].

The act of 1803, allowing the three months' extra wages remained in full force until 1840 (chapter 48 [5 Stat. 394]), which allowed the consul to discharge seamen upon application of the master and mariners if he deemed it expedient without requiring payment of the three months' wages. In 1855, by chapter 133, § 15 [10 Stat. 624], it was enacted, "that in cases of stranded vessels, or vessels condemned as unfit for service, no payment of extra wages shall be required." In 1856, c. 127, § 26 [11 Stat. 62] the provisions of the act of 1840, relieving the master from the payment of the extra wages at the consul's discretion were repealed, and such payments were again required, provided "that in cases of wrecked or stranded vessels, or ships or vessels condemned as unfit for service, no payment of extra wages shall be required." This language was more comprehensive than that of the act of 1855, as it embraced wrecked vessels, which were not included in the former law, and it is the precise language found in section 4583, under which the respondents claim their exemption in the present suit.

When we consider the nature of the seaman's contract, as construed by the courts of this country, that the law implies a seaworthy ship on the part of the owner, and that wages were always recoverable by the sailor, if by the neglect of the master or owner the freight or ship was lost, and also remember the construction given by the courts to the act of 1803, that owners were exonerated from liability for extra wages, although within the letter of the act, when the vessel was sold, because the damages she had sustained from the perils of the sea had rendered her sale necessary within the meaning of the maritime law, but were held accountable for extra wages, if the vessel was condemned and sold for unseaworthiness at the commencement of the voyage, I can not but think that a literal strict construction of the exemption provided for by section 4583 was not the intention of congress, but that it was rather its purpose only to exonerate the master and owner from this liability, when the enterprise is determined by a loss or condemnation of the vessel for which her owners are not directly responsible by their own neglect. If a ship was stranded by a master by collusion with the owners to defraud insurers, and the vessel was totally lost, could it be that the owners would be held exonerated from payment of the extra wages? The stranding of the ship would bring the case within the letter of the act, and nothing is there found which expressly authorizes any distinction to be drawn when the stranding is designedly had by the master, or when caused by the perils of the sea; but to give such a construction as would relieve the party under such circumstances

from extra wages by reason of his own criminal conduct would be so gross a perversion of justice that I can never assent to it, until I am instructed so to do by those who are authorized to review and correct the errors of this court.

It may be said, that in the instance supposed, a party is endeavoring to obtain an advantage by his own fraud, and that fraud vitiates and destroys all claims for any rights arising thereby. This is true; but still this supposed case is within the very letter of the statute. In the present case the condemnation was not occasioned by any fraud of the owners, but it was on account of their violation of their contract by exposing all on board to the perils of the sea, in an old worn out and rotten hulk, as the master well knew, and the owner could have known, if he had made the least examination. His negligence in this respect is beyond dispute, and he may well be considered as having sent his vessel to sea in this condition, ready to take the consequences of such gross neglect in matters of so great importance. The condition of the mainmast and mainsail, it is established, were well known to him before she left this port. The condemnation was clearly the result of his own act, in permitting his ship thus unseaworthy to become liable to condemnation on that account in a foreign country. He is the party, who is directly responsible therefor by reason of his own neglect, and the enterprise was not brought to a premature conclusion by any fortuitous event. as the master testified, that if he had had proper and fit sails, when off Hatteras he could have made Philadelphia, and would not have been obliged to run off the coast. "Nullum commodum capere potest de injuria sua propria. Frustra legis auxilium quaerit qui in legem committit."

In my opinion, it was never the intention of congress by this provision to modify the law, and exonerate ship-owners from liability for extra wages when their ship was lost or condemned on account of their own fraud or willful negligence. It is so contrary to justice and the best interests of all concerned in navigation, that a party should be permitted to avoid his accountability by his own wrong, that unless constrained so to do, we should not adopt a construction favorable to such a purpose.

My construction of this provision of the law is sustained by other provisions found in the same title relative to merchant seamen. By sections 4559-4561, it is provided that a complaint may be made of the unseaworthy condition of their ship by the officers and crew to a consul in any foreign port, and he shall appoint inspectors to examine into the matter of such complaint. In their report they shall state whether in their opinion, the vessel was sent to sea, unsuitably provided in any important or essential particular, by neglect or design, or through mistake or accident; and in

case it was by neglect or design, and the consul approves of such finding, he shall discharge such of the crew as desire it, each of whom shall be entitled to the three months' pay in addition to his wages up to the time of discharge. There can be no question, that if such complaint had been made in the present case, the report of the inspectors would have convicted the owner of negligence in sending this vessel to sea in the condition she was, and that the consul would have approved of such report, and required the payment of the three months' wages, notwithstanding the vessel was condemned as unfit for service. The case would have been within the letter of section 4583. but would have been saved therefrom by section 4561, thus indicating that some limitation was intended to the general language of section 4583, and declaring that when such vessel is condemned by reason of her owner's neglect in her outfit, they are still held chargeable for the extra wages. It may be that this section submits the matter to the judgment of the inspectors and consul, and unless the neglect is found by them, that the liability for extra wages cannot be sustained under this section, and that it is not for the court to assume to discharge the duties by law specially devolved on other officers. The answer is, that a court of admiralty does not derive its authority to allow extra wages under this section; but these provisions may well be invoked in aid of the true construction of the other sections, and as indicative of the purpose of congress not to require a strict literal compliance with the words therein contained. The spirit and intent of the act is quite apparent from section 4561 that an owner's negligence shall not exonerate him from the general liability imposed upon him by other sections of this title, and I can have no doubt, that under these sections a court of admiralty, by its general power and authority inherent in this tribunal, may afford the seaman that redress to which he is entitled, although the consul may have failed to require the payment of the extra wages under section 4561. By the same title it is made the duty of the consul to collect the extra wages under section 4582; but if he neglects so to do. it is every day's practice for a court of admiralty to sustain suit therefor against master or owner.

The only case I have found having any direct bearing on this question is Hoffman v. Yarrington [Case No. 6,580]. In his opinion, the learned judge says: "The act of 1856 provides that in case of wrecked or stranded ships or vessels, or ship or vessels condemned as unfit for service, no payment of extra wages shall be required. The language seems to include all vessels condemned as unfit for service, whether their unfitness has arisen from wreck or stranding or any other cause. Without saying that it would apply when a vessel has been sent to sea in such a condition that her owners ought to have known she was unfit, or even to a case where there has been no extraordinary peril, as to which I shall speak

more at large hereafter, I hold this statute denies the extra wages, when the facts merely are, that a vessel needing repairs from a sea peril has been condemned, and the master has acted in good faith, and his conduct has been such as a prudent owner would have adopted in like circumstances, had he been uninsured." I am aware that in 2 Pars. Shipp. & Adm. 86, that learned judge is credited with a somewhat different statement of his opinion in Hoffman v. Yarrington [supra], one not altogether in harmony with the views here entertained by me, or with the language above given from his reports. This work of Mr. Parsons was published before the reports of Mr. Justice Lowell, and I am bound to adopt as his views the opinion carefully prepared by him and sent forth to the profession by his authority, rather than an abstract of the opinion by a third party, which is not shown to have received the sanction and approval of the learned judge.

I infer from the cautious and guarded manner in which Judge Lowell refers to the question here presented, that he was not convinced that the statute did apply to a case like the present to relieve the owner from his liability. Extra wages being given by the statute in place of damages for breach of contract, it is quite clear that in such cases the seamen are not entitled to the expenses of their return home in addition to the extra wages. Hoffman v. Yarrington, supra.

Claim is also made by the libellants under section 4529 for two days' extra pay for ten days after their discharge, for non-payment of one fourth of the wages then due. The language is, "every master or owner who neglects or refuses to make payment, &c., without sufficient cause, shall pay to the seamen, &c." There are two answers to this claim. The neglect, if any, was on the part of the master and not the owner, as he was not at Nassau, and the present suit is against the owners and not the master. Secondly, there was sufficient cause for non-payment; the net amount of sales, after payment of expenses at Nassau, was distributed by the consul among the officers and crew of the vessel, and the owner should not be required to forward funds to a foreign port to pay the seamen, in anticipation that the sale of the wreck would not prove sufficient for that purpose, and it is not apparent that the master could in any way have raised the necessary amount at that port. The condition of things at the time affords a sufficient excuse for the non-payment of anything beyond the net amount realized from the vessel. The cook is not shown to have been aware before sailing of the unseaworthiness of the vessel, and he is therefore, in my opinion, clearly entitled to the extra wages. The mate's case is of a much more doubtful nature, as he admits that he had sailed in the vessel the previous voyage, and of course must have been aware of the condition of her sails and rigging. It does not appear that he knew the state of the hull, and he had the assurance of the managing owner, that a new mainsail

should be had, which was one of the most important and necessary articles to render her seaworthy. He knew the mainmast-head was defective, but the master was of opinion that it would answer for the voyage, and if she had been furnished with a new mainsail, I am rather of the opinion that the vessel would have been enabled to reach Philadelphia; with some hesitation I shall allow the mate the extra wages, notwithstanding he was aware of some matters in which the vessel was hardly to be deemed seaworthy, as I think she was unseaworthy in other respects of which he is not shown to have been cognizant, and especially as he has a right to depend upon the owner's promise of a new mainsail, the want of which was one of the most important elements of her unseaworthiness. The court cannot but fear that the Wenonah was only one of a large fleet of our American vessels which are kept at sea by reason of the cupidity of their owners, when they should be broken up and destroyed. The British parliament has lately taken measures to drive such rotten hulks from the ocean, and it is to be hoped congress will soon follow this example by such appropriate legislation as may be effectual to accomplish so desirable a purpose.

A claim for $13 for board, at Portland, of the mate after he joined the brig, but before she was ready for sea, is not allowed, as upon all the testimony I do not find that the owners at the time they contracted with the mate, agreed to pay his board. I allow the mate John Nicol, a balance of wages $103.21 and two months' extra wages $50, and that he also recover one month's extra wages $40, which will be retained in the registry for the use of the United States according to the regulations of the statute. To the cook Joseph Stanton, I allow the balance of his wages $95.20 and two months' extra wages $70, and wages for one month $35, for the use of the United States to be retained in the registry. Decree accordingly.