UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-30102

_____

THE GOVERNOR AND COMPANY OF
THE BANK OF SCOTLAND,

Plaintiff-Appellee,

versus

HECTOR SABAY; VOLODYMYR SHEVCHUK;
NORMAN SOLIS; NOEL SOMOSIERRA; GERRY SUYAT, ET AL.,

Intervenors-Appellants,

versus

MARIA S. J. MV, her engines, tackle, lifeboats,
anchor, chain, equipment and appurtenances, in rem, ET AL.,

Defendants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

April 28, 2000

Before JONES, BARKSDALE, and DENNIS, Circuit Judges.[1]

RHESA HAWKINS BARKSDALE, Circuit Judge:

For this 28 U.S.C. § 1292(a)(3) interlocutory appeal, the issue is one of first impression:  can a seaman's preferred maritime lien for 46 U.S.C. § 10313(g) "penalty" wages be enforced against the proceeds from the sale of the vessel on which he served, when those proceeds are less than the indebtedness secured

_____

[1]Judge Dennis reserves the right to file an opinion.

by a preferred mortgage for the vessel, and in the light of the plain language of the penalty wages statute, which imposes liability on *only* the vessel's master or owner (if wages *not* paid within specified time "without sufficient cause, the *master or owner* shall pay to the seaman 2 days' wages for each day payment is delayed") (emphasis added). The district court held the lien could *not* be enforced. We **AFFIRM**.

I.

On 30 July 1996, Golden Lines Shipping, Inc., owner of the M/V MARIA S.J., and Golden Mediterranean Lines, Inc., owner of the M/V NINA S, were loaned approximately $15 million by the Governor and Company of the Bank of Scotland. The loan amount was *not* to "exceed ... 70% of the [vessels'] aggregate market value", with a satisfactory valuation for each being required; Golden Lines was to notify the Bank when any legal action, likely to have a material adverse effect on Golden Lines or the operation of its vessel, was either threatened or instituted; and the Bank received a first preferred ship mortgage on each vessel.

In the mortgage, Golden Lines covenanted that it would, *inter alia*, "promptly pay and discharge all debts, damages and liabilities whatsoever which have given or may give rise to maritime or possessory liens on or claims enforceable against" the MARIA, and "furnish satisfactory evidence that the wages ... of the ... crew are being regularly paid".

In addition to the mortgages, security for the loan included the assignment of proceeds from charter party agreements covering the MARIA and NINA, and a personal guarantee from Nikolaos Mazarakis, president and sole shareholder of Golden Lines, who was also the manager of Kosmas Marine Line, Inc., which managed the MARIA, NINA, and M/V NORSE TRADER. (The NORSE TRADER, owned by Konim Shipping Co., Ltd., was subject to a separate loan agreement and mortgage in favor of the Bank.)

In March 1997, while the MARIA was in the Mississippi River in Louisiana, its seamen complained about being underpaid and retained counsel. Following negotiations with Golden Lines, a settlement agreement was reached later that month.

As consideration for the seamen *not* having the vessel arrested, Golden Lines agreed, *inter alia*, to make a partial payment that day against the wage arrearage, with the balance to be paid at the next port of call (Houston, Texas). Golden Lines stipulated that, if the agreement was *not* satisfied punctually, it was in violation of 46 U.S.C. § 10313 (penalty wages) as of 24 March 1997, the day of the settlement, "and that *penalty wages shall commence to run* as of" that date. (Emphasis added.) Golden Lines failed to pay the wages due.

On 30 March 1998, approximately a year after the wages-settlement, the Bank issued notices of default for the loans secured by the three vessels. On 7 April, in response to

3

Mazarakis' request for release from his personal guarantees for the loans secured by those vessels, the Bank advised that release would be recommended *if* he cooperated in their arrest and sale.

The MARIA re-entered the Mississippi River in the spring of 1998. All on 22 April, the seamen aboard filed an unpaid wages action in Louisiana state court against Golden Lines and Kosmas Marine Line; the court issued a writ of attachment; and the MARIA was taken into the custody of the sheriff.

Five days earlier, on 17 April, the Bank had filed a complaint in federal court against the MARIA, *in rem*, and Golden Lines, *in personam*, to foreclose its mortgage on the vessel. That same day, the district court issued an arrest warrant for the vessel; it was served on 29 April. In mid-May, Kosmas Marine Line and Golden Lines removed the seamen's state court action to federal court, where it was consolidated with the Bank's foreclosure proceeding.

That May, the Bank paid the wages owed the seamen aboard the MARIA at the time of arrest, and they were repatriated; the Bank took an assignment of their wage liens. Seamen still claimed to be owed *past due wages* in excess of $250,000. (As discussed *infra*, such wages were paid from the sale proceeds a year later, in May 1999.)

In June 1998, the seamen filed a complaint in intervention in the Bank's foreclosure proceeding, seeking to enforce maritime

4

liens against the vessel for unpaid wages *and penalty wages for each day of delay in payment of earned wages*.

That July, the MARIA was sold at a judicial auction to the Bank, which bid $3.7 million. The Bank agreed to satisfy any liens determined to have priority over the mortgage, up to the amount of sale proceeds, less *custodia legis* expenses. (The prior month, the NINA had been sold at auction; that September, the Bank received approximately $3.6 million from the sale proceeds.)

The MARIA seamen asserting penalty wages liens consist of two groups: (1) 22 serving on 24 March 1997, covered by the settlement agreement of that date with Golden Lines; and (2) 25 serving on 20 April 1998, the day they formally demanded payment of past-due wages, two days prior to filing the state court action.

The Bank's motion for partial summary judgment was granted in part. The court ruled that: the seamen had preferred maritime liens for wages and penalty wages; the latter had the same priority as the former; the wages liens were entitled to priority over the Bank's preferred ship mortgage; *but*, the seamen could *not* enforce their penalty wages liens against the vessel sale proceeds. The court reasoned that: the vessel's master and owner had *no* interest in those proceeds, because the amount owed the Bank exceeded that realized from the sale; and permitting a penalty wages claim against the proceeds was the functional equivalent of allowing the claim against a party other than the master or owner, contrary to

the penalty wages statute, which expressly imposes liability only against them. *See* 46 U.S.C. § 10313(g).

In June 1999, after this appeal was filed, the district court granted the seamen summary judgment against Golden Lines, *in personam*, and the MARIA, *in rem*, for approximately $261,000 in unpaid wages, plus pre-judgment interest. The unpaid wages lien was satisfied from the vessel sale proceeds. (Therefore, penalty wages ceased when those wages were paid.) In addition, the seamen's unopposed summary judgment motion against Golden Lines, *in personam*, for penalty wages of approximately $7 million was granted.[2]

## II.

The seamen contend that the district court erred in holding they *cannot* enforce their preferred maritime lien for penalty wages against the MARIA sale proceeds, without determining whether, when the wages were due, Golden Lines had "sufficient cause" for their non-payment; and in failing to consider evidence that the Bank failed to mitigate its losses by *not* enforcing guarantees securing

---

[2]The *in personam* judgment against Golden Lines is, in all likelihood, uncollectible. At a hearing in December 1998, its counsel stated that the corporation no longer existed, because it had *no* assets and was conducting *no* operations. And, in January 1999, its counsel was allowed to withdraw, having advised the court that Golden Lines had advised him that, as a result of its severe financial condition, it would cease all operations.

6

the loan.[3]  The Bank counters that allowing the seamen to recover penalty wages from the sale proceeds would violate the Due Process Clause of the Fifth Amendment and create conflicts between Supreme Court decisions and between the penalty wages statute and the Ship Mortgage Act, while *not* advancing Congress' intent to impose penalty wages liability only on vessel masters or owners.

A summary judgment is reviewed *de novo*, using the standard applied by the district court.  *E.g.*, **Forsyth v. Barr**, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  Such

---

[3]The seamen also contend, *for the first time on appeal*, that the Bank's claim should be equitably subordinated to their penalty wages liens, claiming the Bank's collusive conduct with Mazarakis conferred an unfair advantage on the Bank and harmed the seamen, who, unlike the Bank, had *no* other security from which to obtain satisfaction of their liens.  Because this claim was *not* presented in district court, the seamen must show the existence of a plain error that affected their substantial rights, and also must persuade us to exercise our discretion to correct it.  *See* **Highlands Ins. Co. v. National Union Fire Ins. Co.**, 27 F.3d 1027, 1032 (5th Cir. 1994), *cert. denied*, 513 U.S. 1112 (1995).  They have *not* done so.  *Cf.* **Custom Fuel Servs., Inc. v. Lombas Indus., Inc.**, 805 F.2d 561, 566-67 (5th Cir. 1986) (applying equitable subordination to subordinate Bank's preferred ship mortgage to claims of other maritime lienors where bank transferred title to vessel to its wholly owned, undercapitalized subsidiary and took preferred ship mortgage, and bank controlled subsidiary, using it as mere instrumentality to accomplish lease of vessel to charterer).

Even assuming that the issue was preserved by the seamen, through their contention in district court that, prior to foreclosing on the mortgage, the Bank should have been required to mitigate its losses by enforcing its other security interests, including Mazarakis' personal guarantee, the district court did *not* err by rejecting it.  Neither the statutes nor the terms of the mortgage condition the Bank's right to foreclose on its pursuing other means of repayment.

7

judgment is mandated when the summary judgment record, viewed in the light most favorable to the non-movant, reveals that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c); *Forsyth*, 19 F.3d at 1533. Resolution of this issue of first impression requires an examination of the language, history, and purposes of the penalty wages statute, 46 U.S.C. § 10313(g), and the Ship Mortgage Act, 46 U.S.C. §§ 31301-31343, as well as the jurisprudence interpreting them.

A.

In truth, *no* authority really need be cited for the fact that seamen, the "wards of admiralty", historically have received favored treatment from the Congress and the admiralty courts. *See Bainbridge v. Merchants' & Miners' Transp. Co.*, 287 U.S. 278, 282 (1932) ("Seamen have always been regarded as wards of the admiralty, and their rights, wrongs, and injuries a special subject of the admiralty jurisdiction. The policy of Congress, as evidenced by its legislation, has been to deal with them as a favored class." (citation omitted)); *Hume v. Moore-McCormack Lines*, 121 F.2d 336, 340-41 & n.13 (2d Cir.) (discussing historical background of judicial solicitude for seamen's rights, including the writings of Lord Stowell and Justice Story), *cert. denied*, 314 U.S. 684 (1941); *see also* 1B BENEDICT ON ADMIRALTY, § 61, at 5-1 (7th ed. 1997); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, Vol. 1, § 6-1,

8

at 239 (2d ed. 1994) ("The protection of seamen was one of the principal reasons for the development of admiralty as a distinct branch of law."); MARTIN J. NORRIS, THE LAW OF SEAMEN, Vol. 1, § 12:1, at 424-26 (4th ed. 1985).

Legislation enacted for seamen's benefit is to be liberally construed in their favor. *See* **Isbrandtsen Co. v. Johnson**, 343 U.S. 779, 782 (1952) ("Whenever congressional legislation in aid of seamen has been considered here since 1872, this Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen."); **Bainbridge**, 287 U.S. at 282 (statutes enacted for seamen's benefit should be liberally construed).

This applies to statutes concerning their wages. **Arguelles v. U.S. Bulk Carriers, Inc.**, 408 F.2d 1065, 1070 (4th Cir. 1969) ("The wage statutes are to be liberally construed in favor of the seaman."), *aff'd*, 400 U.S. 351 (1971). It also holds true for penalty wages. **Forster v. ORO Navigation Co.**, 228 F.2d 319, 319-20 (2d Cir. 1955) (penalty wages "statute, designed to protect seamen, must be liberally interpreted for their benefit"); 1B BENEDICT ON ADMIRALTY, § 66, at 5-16 ("[The penalty wages] statute, like most other statutes protecting the rights of seamen, is liberally construed by the courts.").

The rationale for such concern about seamen's wages was stated in **The David Pratt**, 7 F. Cas. 22, 25 (D. Me. 1839):

> Seamen are not a class of men who ordinarily make provision against the future. On their return from a voyage they are usually dependent on their wages for present support, and if they are withheld they ordinarily find themselves in a state of entire destitution, not only without present means to provide for their immediate and most pressing necessities, but without credit.

Our court has stated that "[w]ages due seamen are given utmost protection by admiralty courts". *First Nat'l Bank of Jefferson Parish v. M/V Lightning Power*, 776 F.2d 1258, 1262 (5th Cir. 1985); *see also* *Brandon v. S.S. Denton*, 302 F.2d 404, 416 (5th Cir. 1962) ("Wages of seamen occupy a unique status. The statutory provision extending them the protection of a preferred maritime lien is deeply rooted in history.").

Seamen's wages were the subject of legislation enacted by the first Congress, giving seamen the right to collect their wages "as soon as the voyage is ended". Act of July 20, 1790, ch. 29, § 6, 1 Stat. 133-34. And, Congress established penalty wages approximately 80 years later, in 1872: a master or owner neglecting or refusing to timely pay a seaman's wages as specified in the statute "*without sufficient cause* shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed ...; and such sum shall be recoverable as wages in any claim made before the court". Shipping Commissioners Act of 1872, ch. 322, § 35, 17 Stat. 269 (emphasis added).

10

The 1790 and 1872 statutes were the basis for § 4529 of the Revised Statutes, which contained language substantially identical to that in the 1872 statute. REV. STAT. § 4529 (2d ed. 1878). In 1898, when the statute was amended, Congress eliminated the ten-day limitation for penalty wages, but decreased the penalty from two to one day's pay for each day of delay. Act of Dec. 21, 1898, ch. 28, § 4, 30 Stat. 756 ("[e]very master or owner who refuses or neglects to make payment in manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the respective periods"). In 1915, the penalty was doubled to the present two days' pay for each delay-day. Seamen's Act of 1915, ch. 153, § 3, 38 Stat. 1164-65, codified at 46 U.S.C. § 596.

The language at issue was amended for the last time in 1983, when the maritime laws were recodified. *See* Pub. L. No. 98-89, 97 Stat. 566 (1983). The current version, found in 46 U.S.C. § 10313, provides, in pertinent part:

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.

> (g) When payment is *not* made as provided under subsection (f) of this section *without sufficient cause*, the *master or owner* shall

pay to the seaman 2 days' wages for each day payment is delayed.

....

(i) This section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section.

(Emphasis added.)

As described in numerous opinions, penalty wages are "to secure prompt payment of seamen's wages ... and thus to protect them from the harsh consequences of *arbitrary and unscrupulous action of their employers*, to which, as a class, they are peculiarly exposed". *Collie v. Fergusson*, 281 U.S. 52, 55 (1930) (emphasis added). That purpose was to be accomplished "by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment *when payment is possible*". *Id.* at 55-56 (emphasis added).[4]

---

[4]*See also* **Henry v. S/S Bermuda Star**, 863 F.2d 1225, 1240 (5th Cir. 1989) ("more recently the Supreme Court has emphasized that Congress sought to prevent the unjust enrichment *of shipowners* who denied seamen wages and benefits rightfully earned" (emphasis added)); **Chung, Yong Il v. Overseas Navigation Co.**, 774 F.2d 1043, 1049 (11th Cir. 1985) (purpose of statute "is to provide for the prompt payment of wages to a discharged seaman ... and to ensure that a seaman is *not* turned ashore with little or no money" (emphasis added)), *cert. denied*, 475 U.S. 1147 (1986); **Mavromatis v. United Greek Shipowners Corp.**, 179 F.2d 310, 315 (1st Cir. 1950) ("[t]hese paternalistic provisions in favor of seamen ... were designed to protect from overreaching a generally impecunious and improvident class of persons, and to insure that seamen will not be turned ashore with little or nothing").

12

As discussed *infra*, a seaman has a maritime lien for penalty wages. The maritime lien is "a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away". *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir.) (en banc), *cert. denied*, 479 U.S. 984 (1986).

> The lien is a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds.... Thus the maritime lien may be defined as a property right that adheres to the vessel wherever it may go.... Such a lien has been held to follow the vessel even after it is sold to an innocent purchaser.... The maritime lien is a lien on the vessel, and only indirectly, inasmuch as it conflicts with the owner's rights in the vessel, it is connected with the owner.... The maritime lien concept thus somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner.

*Id*. (internal quotation marks and citations omitted).

Under the common law, seamen had a maritime lien against the vessel to secure their wages, enforceable by an action *in rem*. *See Leon v. Galceran*, 78 U.S. (11 Wall.) 185, 187 (1870); *Sheppard v. Taylor*, 30 U.S. (5 Pet.) 675, 709-10 (1831); *Irving Trust Co. v. The Golden Sail*, 197 F. Supp. 777, 779 (D. Ore. 1961) ("It is legend

13

that the unpaid 'wages of the crew' is a libel against the vessel in rem.").

Moreover, under the Ship Mortgage Act, as discussed *infra*, seamen's wages liens are "preferred maritime liens", having priority over preferred ship mortgages. *See* 46 U.S.C. § 31326(b)(1); ***M/V Lightning Power***, 776 F.2d at 1262; ***Brandon***, 302 F.2d at 415; ***Crabtree v. The SS Julia***, 290 F.2d 478, 482 (5th Cir. 1961); ***Scrofani v. Miami Rare Bird Farm, Inc.***, 208 F.2d 461, 464 (5th Cir. 1953); ***United States v. ZP Chandon***, 889 F.2d 233, 237 (9th Cir. 1989).

The reasons for the seamen's wages lien include the following:

> The ship may be the only valuable security on which the seamen can rely. The seaman is the traditional ward of the admiralty court. Finally, without the seaman's efforts in bringing the ship safely to port, there would be no *res* against which other creditors could assert claims.

***International Paint Co. v. M/V Mission Viking***, 637 F.2d 382, 385 (5th Cir. 1981); *see also* NORRIS, THE LAW OF SEAMEN, Vol. 1, § 20:7, at 584–85.

Like other maritime liens, a seaman's wages lien, as noted, is enforceable in an action *in rem*. *See* FED. R. CIV. P. SUPPLEMENTAL RULE FOR CERTAIN ADMIRALTY & MARITIME CLAIMS (C)(1) ("An action in rem may be brought ... [t]o enforce any maritime lien"); ***Riffe Petroleum Co. v. Cibro Sales Corp.***, 601 F.2d 1385, 1389 (10th Cir. 1979). And, as discussed, a maritime lien "arises when the debt arises, and

14

grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds". *Equilease*, 793 F.2d at 602; *see also* NORRIS, THE LAW OF SEAMEN, Vol. 1, § 20:2, at 578 ("The maritime lien is a privileged claim giving to the creditor a special right in the ship which arises from the moment when the claim attaches and which he can enforce by an action *in rem*, *i.e.*, having the ship sold so that the debt might be paid out of the proceeds of the sale."); SCHOENBAUM, ADMIRALTY AND MARITIME LAW, Vol. 1, § 9-1, at 490 ("A maritime lien arises from the moment of the service or occurrence that provides its basis.").

Seamen's wages liens have been referred to as "sacred" liens:

> Wages of seamen occupy a unique status. The statutory provision extending them the protection of a preferred maritime lien is deeply rooted in history. Seamen's wages, "according to the favorite saying of Lord Stowell and of Mr. Justice Story, are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." The statutes throw around seamen's wages most definite, detailed, and stringent protections from faraway *owners* of vessels, from *shipmasters*, and from the seaman himself....

*Brandon*, 302 F.2d at 416 (quoting *The John G. Stevens*, 170 U.S. 113, 119 (1898)) (emphasis added). Accordingly, a maritime lien for seamen's wages is *not* subject to any filing or recording requirements. *ZP Chandon*, 889 F.2d at 238.

15

Several courts (including the district court in this case) have ruled not only that seamen also have a maritime lien for penalty wages, *see* **The Great Canton**, 299 F. 953 (E.D.N.Y. 1924) (rejecting contention that seaman's entitlement to penalty wages is only against master or owner and *not* a lien against the vessel), but also that the penalty wages lien has the same priority as one for earned wages. *See* **Collie**, 281 U.S. at 54 ("[t]he claim for double wages which, when valid, is by the terms of the statute 'recoverable as wages,' has been held to be embraced in the seaman's lien for wages, with priority over other liens, and governed by the procedure applicable to suits for the recovery of seamen's wages"); **Peterson v. S.S. Wahcondah**, 331 F.2d 44, 48 (5th Cir. 1964) (quoting **Collie** for proposition that penalty wages lien has same priority as wages lien).[5]

---

[5]*See also* **Chung, Yong Il**, 774 F.2d at 1049 ("the penalty wage provision is fully consistent with the notion that a seaman has a 'sacred lien' against a vessel for his earnings"); **Buckley v. Oceanic S.S. Co.**, 5 F.2d 545, 546 (9th Cir. 1925) (because penalty wages claim "is for extra wages as incidental to the wages proper, it stands upon no different basis than does the claim for wages proper"); **Gerber v. Spencer**, 278 F. 886, 889 (9th Cir. 1922) (penalty wages are "an incident to the claim of wages proper" and lien has same priority as lien for earned wages); **Peterson v. S.S. Wahcondah**, 235 F. Supp. 698, 700 (E.D. La. 1964) (on remand: "[t]he seamen's lien for penalty wages is accorded the same sacred priority as the lien for wages, and attaches to proceeds from both the sale of the vessel and the earned 'freight'"); **The Chester**, 25 F.2d 908, 910 (D. Md. 1928) ("[M]oney payable ... as [penalty] wages ... is payable essentially as wages, and not penalties.... [I]t is axiomatic that seamen have a lien upon the vessel for their wages. Thus it follows that they must also have a lien for any and all sums payable under [the penalty wages statute], and not merely

16

In district court, the Bank noted that the current penalty wages statute does *not* include the following language found in the provisions first enacted in 1872 and repeated in each version preceding the current one: "which sum shall be recoverable as wages in any claim made before the court". Accordingly, it urged there was no longer any basis for a penalty wages lien having the same priority as one for earned wages.

We agree with the district court's rejection of this contention, for two reasons. First, the current statute describes the penalty as "2 days' *wages*", 46 U.S.C. § 10313(g) (emphasis added), rather than, as in its predecessors, "a sum equal to two days' pay ..., which sum shall be recoverable as wages". *See*

a right to enforce a personal claim against the master or owner."); *The Fort Gaines*, 18 F.2d 413, 414 (D. Md. 1927) (penalty wages lien has same priority as lien for wages); *Feldman v. American Palestine Line, Inc. (The President Arthur)*, 25 F.2d 1002, 1002-03 (S.D.N.Y. 1926) ("the law is settled ... that extra pay allowed under [the penalty wages statute], is an incident to wages proper, is recoverable as wages, and ranks with wages as a prior lien"); *The Trader*, 17 F.2d 623, 625 (E.D.S.C. 1926) (Penalty wages "are an incident to and a part of the actual wages, just as much as interest is an incident to and a part of a debt. They are intended as compensation for the delay in payment, and, inasmuch as they are an incident to and a part of the wages, they will constitute a maritime lien on the vessel, the same as wages."); *The Chas. L. Baylis*, 25 F. 862, 863 (S.D.N.Y. 1885) (penalty wages are "an incident to ... claim of wages proper, and rank[] with ... wages as a prior lien"); *Cox v. Lykes Bros.*, 143 N.E. 226, 227 (N.Y. 1924) (in penalty wages statute, "Congress, imposing a liability for the benefit of seamen, has put it on the same plane as a liability for wages, and has said that the two shall be enforceable together"); *cf. Covert v. The British Brig Wexford*, 3 F. 577, 578-79 (S.D.N.Y. 1880) (interpreting British merchant shipping act's penalty wages provision as providing lien for penalty wages with same priority as wages lien).

17

Seamen's Act of 1915, ch. 153, § 3, 38 Stat. 1164-65.  Second, the legislative history reflects that *no* change in the substantive law was intended.  *See* S. REP. 98-56, 98th Cong., 1st Sess. 1, 10 (1983) ("There are no substantive changes of a controversial nature intended to be made by this bill....  In a codification statute, ... no change in law is intended unless clearly expressed.").

B.

Prior to the enactment in 1920 of the Ship Mortgage Act (now codified at 46 U.S.C. §§ 31301-31343), a ship mortgage was *not* a maritime contract and was *not* within admiralty jurisdiction.  *See The Thomas Barlum*, 293 U.S. 21, 32 (1934); *Bogart v. The John Jay*, 58 U.S. (17 How.) 399, 402 (1854); *Brandon*, 302 F.2d at 412. Accordingly, "mortgage security on ships was practically worthless", *Barlum,* 293 U.S. at 39 (internal quotation marks and citations omitted), because "ship mortgages were *not* entitled to enforcement by maritime liens and were subordinate to all of the many maritime liens a ship might incur".  *Long Island Tankers Corp. v. S.S. Kaimana*, 265 F. Supp. 723, 725 (N.D. Cal. 1967) (emphasis added), *aff'd*, 401 F.2d 182 (9th Cir. 1968), *cert. denied*, 393 U.S. 1095 (1969); *see also* 2 BENEDICT ON ADMIRALTY, § 69a, at 6-18 - 6-21 (discussing history and purpose of Ship Mortgage Act).

The Ship Mortgage Act was intended to remedy this problem.  It was to "provide for the promotion and maintenance of the American

merchant marine", by making ship mortgagees more secure than under the existing law. *Long Island Tankers*, 265 F. Supp. at 725.[6]

Under the Ship Mortgage Act, a valid ship mortgage meeting the requirements of 46 U.S.C. § 31322 is a "preferred mortgage", which "is a lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel". 46 U.S.C. § 31325(a). Upon default, the mortgagee may, *inter alia*, "enforce the preferred mortgage lien in a civil action in rem". 46 U.S.C. § 31325(b)(1).

When a vessel is sold to enforce either a preferred mortgage lien or a maritime lien, all claims *in the vessel* are terminated. 46 U.S.C. § 31326(a). But, such terminated claims "attach[], in the same amount and in accordance with their priorities to the proceeds of the sale". 46 U.S.C. § 31326(b).[7]

---

[6]*See also* **Custom Fuel Servs.**, 805 F.2d at 568 ("[t]he primary purpose of the Ship Mortgage Act is to induce private capital to invest in shipping"); **Equilease**, 793 F.2d at 602 ("History shows that the merchant marine industry was faltering in 1910; Congress passed the Act in an attempt to spur incentive for the financing of shipowners by making private investment in shipping more attractive than it had been."); **First Nat'l Bank & Trust Co. of Escanaba v. Oil Screw Olive L. Moore**, 379 F. Supp. 1382, 1390 (W.D. Mich. 1973) ("Clearly the policy of the Ship Mortgage Act was to spur incentive for the financing of shipowners in an effort to strengthen a faltering merchant marine."), *aff'd*, 521 F.2d 1401 (6th Cir. 1975).

[7]*See also* **Sheppard**, 30 U.S. (5 Pet.) at 710 (seamen's wages lien attaches to proceeds of vessel); **Barlum**, 293 U.S. at 35 ("on foreclosure and sale in admiralty, all pre-existing claims in the vessel are to be held terminated and thereafter are to attach to the proceeds of the sale"); **American Bank of Wage Claims v. Registry of Dist. Ct. of Guam**, 431 F.2d 1215, 1218 (9th Cir. 1970) ("The proceeds from the judicial sale of a vessel, or security furnished in lieu thereof, are deemed a jurisdictional substitute for the vessel itself.").

A preferred ship mortgage "has priority over all claims against the vessel (*except for* expenses and fees allowed by the court, costs imposed by the court, and *preferred maritime liens*)".  46 U.S.C. § 31326(b)(1) (emphasis added).  And, of particular interest here, a "preferred maritime lien" includes "a maritime lien on a vessel ... for wages of the crew of the vessel".  46 U.S.C. § 31301(5)(D).  In *Kopac Int'l, Inc. v. M/V Bold Venture*, 638 F. Supp. 87, 90 (W.D. Wash. 1986), the court reasoned that wages liens were given priority over a preferred ship mortgage "generally because these liens must be favored to ensure that the vessel is kept moving in trade ... [and such priority] serves indirectly to protect the mortgagee's interests because the mortgagee wants the vessel to operate".

C.

For the precise factual context at issue, we have found *no* cases applying the penalty wages statute and the Ship Mortgage Act. The plain language of the penalty wages statute imposes liability *only* on the "master or owner"; the jurisprudence interpreting it gives seamen a maritime lien against the vessel for such wages, which attaches at the moment earned wages are *not* timely paid pursuant to the statute; and the plain language of the Ship Mortgage Act gives wages liens preferred status, including priority over a preferred ship mortgage.  But, on sale of the vessel, can that penalty wages lien be enforced against the proceeds *if* they are less than the amount secured by the preferred ship mortgage, so that *no*

20

interest is then held by the owner, the entity liable under the plain language of the penalty wages statute?

The district court agreed with the Bank that penalty wages liens are *not* enforceable against the proceeds *unless* the owner has an interest in them *at the time of attempted enforcement of the penalty wages lien.* Because Golden Lines' indebtedness, secured by the Bank's preferred ship mortgage, exceeded the sale proceeds, the court concluded that the seamen could *not* recover penalty wages from them, *because Golden Lines had no interest in them*.

The seamen contend that, instead, the court should have focused on whether the owner had an interest in the vessel *at the time the penalty wages lien attached;* in other words, in the language of the statute's subpart (g), whether the owner had "sufficient cause" for non-payment of earned wages when they became due. *See* 46 U.S.C. § 10313(g).

As discussed, it is well-settled that a maritime lien "creates an interest in the vessel, and the vessel itself, as an entity apart from its owner, may be seized and held liable to enforce the lien". ***Merchants Nat'l Bank of Mobile v. Dredge Gen. G.L. Gillespie***, 663 F.2d 1338, 1345 (5th Cir. 1981), *cert. dismissed*, 456 U.S. 966 (1982). Justice Story stated in ***The Nestor***, 18 F. Cas. 9 (D. Me. 1831):

> The lien for seamen's wages attaches ordinarily on the ship during the voyage, although no wages are strictly due until the end of the

21

voyage. A sale of the ship, pending the voyage, would not defeat this inchoate lien; and when the voyage was completed, the lien would have relation back to the commencement of the voyage.

*Id*. at 14.

Subsequent cases are, of course, to the same effect. *See* **The John G. Stevens**, 170 U.S. at 117 ("a maritime lien is created as soon as the claim comes into being"); **McCrea v. United States**, 294 U.S. 23, 32 (1935) ("[L]iability for double wages accrues, if at all, from the end of the period within which payment should have been made. It must be determined by the happening of an event within the period, failure to pay wages without sufficient cause."); **Equilease**, 793 F.2d at 602 ("[maritime] lien arises when the debt arises").

And, under our precedent, a penalty wages lien has the same priority as a wages lien. **Peterson**, 331 F.2d at 48. The penalty wages lien attached to the vessel when, without sufficient cause, Golden Lines failed to timely pay the wages.

Pursuant to the Ship Mortgage Act, that lien was terminated by the judicial sale of the vessel, 46 U.S.C. § 31326(a). But, it attached to the sale proceeds, as a preferred maritime lien with priority over the Bank's preferred ship mortgage. 46 U.S.C. §§ 31301(5)(D), 31326(b)(1).

Language in several cases supports the seamen's contention that the owner's interest in the vessel should be determined when the

22

penalty wages lien attaches, rather than later, on attempted lien enforcement.  *See **Alier v. Sea Land Serv., Inc.***, 465 F. Supp. 1106, 1110 (D.P.R. 1979) ("the essential spirit and purpose of the [penalty wages] statute is to financially punish *the vessel*, its owner and/or its master, as the case may be, for the neglectful failure to pay wages" (emphasis added)); ***Peterson v. S.S. Wahcondah***, 235 F. Supp. 698, 700 (E.D. La. 1964) ("Inherent in the language of the statute then is a pre-requisite that some fund exist out of which the owner or its agents *could have paid the regular wages when they became due, or paid them sometime thereafter*" (emphasis added)); *see also* 1B BENEDICT ON ADMIRALTY, § 66, at 5-16 ("The vessel owner will *not* have to pay double wages if, *at the time wages are due*, the master withholds payment for sufficient cause." (emphasis added)).

On the other hand, it bears repeating that the penalty wages statute imposes liability *only* on the vessel's "master or owner". 46 U.S.C. § 10313(g) ("When payment is *not* made as provided under subsection (f) of this section without sufficient cause, *the master or owner shall pay* to the seaman 2 days' wages for each day payment is delayed." (emphasis added)).  Moreover, the purpose of the statute is to coerce the *master or owner* to promptly pay seamen's wages, unless there is sufficient cause for non-payment.

In support of its contention that penalty wages are *not* recoverable from the sale proceeds *unless* the owner has an interest

23

in those proceeds *when* seamen seek to enforce a penalty wages lien, *rather than when the lien attaches*, the Bank relies heavily on the Supreme Court's opinion in **Collie**. There, seamen sought to recover unpaid and penalty wages from sale proceeds. Because the delay in wages payment was "due to the insolvency of the owner and the arrest of the vessel, subject to accrued claims beyond its value", the Court held the seamen were *not* entitled to penalty wages because there was "sufficient cause" for the non-payment of earned wages. It reasoned:

> The words "refuses or neglects to make payment ... without sufficient cause" connote, either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible. Hence we conclude that the liability is not imposed regardless of the fault of the master or owner, or his retention of any interest in the vessel from which payment could be made. It can afford no such protection and exert no coercive force where delay in payment, as here, is due to the insolvency of the owner and the arrest of the vessel, subject to accrued claims beyond its value. Together these obstacles to payment of wages must be taken to be a sufficient cause to relieve from the statutory liability.... *Otherwise, it would not be imposed on the owner directly or through his interest in the ship, but only upon the lienors, who are neither within the letter nor the spirit of the statute.*

> *That the liability is not incurred* where the refusal to pay is in some reasonable degree morally justified, or *where the demand for wages cannot be satisfied either by the owner or his interest in the ship*, has been the conclusion reached with practical unanimity by the lower federal courts....

281 U.S. at 55-56 (citations omitted; emphasis added). The decisions referenced by **Collie** are discussed *infra*.

Because the owner's insolvency and the arrest of the vessel, taken together, were held in **Collie** to constitute sufficient cause for wages non-payment, the subsequent above-emphasized statement that, otherwise, the penalty would be imposed only on the lienors, is dictum. Moreover, the above-emphasized statement that "liability [for penalty wages] is not incurred ... where the demand for wages cannot be satisfied either by the owner or his interest in the ship", *id*. at 56, implies that liability for penalty wages *is* incurred when the *wages* demand can be satisfied either by the owner *or his interest in the ship*, *i.e.*, when the owner does *not* have "sufficient cause" for non-payment of earned wages. All but one of the cases cited by **Collie** support that implication.[8]

Most of them held seamen were *not* entitled to recover penalty wages because the owner or master had sufficient cause for wages

---

[8]One of the cited cases did *not* involve penalty wages. **The St. Paul**, 77 F. 998 (S.D.N.Y. 1897) (seamen discharged before commencement of voyage entitled to recover compensation *in rem* for 15 days, as provided in former 46 U.S.C. § 594).

non-payment, or delay in payment. *See* **Feldman v. American Palestine Line, Inc. (The President Arthur)**, 25 F.2d 1002, 1003 (S.D.N.Y. 1926); **The Trader**, 17 F.2d 623, 626 (E.D.S.C. 1926); **The Acropolis**, 8 F.2d 110, 110 (E.D.N.Y. 1923) (holding that owner's bankruptcy constituted sufficient cause for non-payment, but stating in dictum that, because "the intent of the statute is to punish the refusal or neglect of the master or owner, and is personal to them[,] therefore subsequent lienors should *not* have the fund to which they must look for payment depleted to pay a penalty which, if even properly allowable, should be paid by the master or owner" (emphasis added)); **Villigas v. United States**, 8 F.2d 300, 301 (E.D.N.Y. 1922); **The Sentinel**, 152 F. 564, 565 (E.D.N.Y. 1907); **The Amazon**, 144 F. 153, 155 (W.D. Wash. 1906); **The Sadie C. Sumner**, 142 F. 611, 612 (D. Mass. 1905); **The Express**, 129 F. 655, 656 (S.D.N.Y. 1904); **The George W. Wells**, 118 F. 761, 763 (D. Mass. 1902); **The Alice B. Phillips**, 106 F. 956, 956 (S.D.N.Y. 1901); **The Gen. McPherson**, 100 F. 860, 864 (D. Wash. 1900); **The Wenonah**, 29 F. Cas. 697, 701 (D. Me. 1875).

In others, because non-payment was held to be without sufficient cause, penalty wages were allowed; but *none* of those cases involved competing liens against vessel sale proceeds. *See* **Gerber v. Spencer**, 278 F. 886, 889-90 (9th Cir. 1922); **Burns v. Fred L. Davis Co.**, 271 F. 439, 444 (1st Cir. 1921); **Pacific Mail S.S. Co.**

*v. Schmidt*, 214 F. 513, 520 (9th Cir. 1914), *rev'd*, 241 U.S. 245 (1916); *The City of Montgomery*, 210 F. 673, 676 (S.D.N.Y. 1913). *Cf*. *The Lake Galewood*, 21 F.2d 987, 988-89 (D. Md. 1927) (although master and owner had sufficient cause for delay in payment, penalty wages allowed because wages were *not* tendered unconditionally), *aff'd*, 25 F.2d 1020 (4th Cir.), *cert. denied*, 278 U.S. 637 (1928).

The only case cited in *Collie* that refused to allow penalty wages recovery from vessel sale proceeds, without relying on finding sufficient cause, is *The Moshulu*, 276 F. 35 (N.D. Cal. 1921). The court's order allowed penalty wages; but, on entry, the court had *no* knowledge of other outstanding liens against the proceeds. Thereafter, the court disallowed the penalty wages, stating:

> [N]either the master nor the owner has any interest in the fund now in the registry of the court resulting from the sale of the vessel. To allow the penalties would be to transfer the burden thereof from the master and owner to the lienholders and the mortgagee. This I do not believe was ever contemplated, or intended, by Congress in enacting the statute in question.

*Id*. at 36. Thus, *The Moshulu* is the only case that supports the Bank's contention that, whether the owner has an interest in the sale proceeds is the determinative factor, *not* whether there was sufficient cause for wages non-payment when they became due.

The *Collie* dictum has been treated as persuasive in several cases. *Nadle v. M.V. Tequilla*, 1973 A.M.C. 909 (S.D.N.Y. 1973), held that, because the sale proceeds were less than the preferred

27

ship mortgage lien, the penalty wages statute was "presumptively *not* applicable, for the burden would fall 'only upon the lienors who are neither within the letter nor the spirit of the statute'". *Id*. at 912 (quoting *Collie*, 281 U.S. at 56) (emphasis added). Nevertheless, the court held the penalty wages claims in abeyance, and referred the case to the magistrate judge to determine whether the owner was solvent *when the vessel was arrested*, stating:

> It may be, of course, that if the shipowner is *not* insolvent recourse may be had against its other assets by the preferred ship mortgagee under his judgment *in personam*. In that event it may appear that the failure to pay wages was, indeed, "without sufficient cause" and that the remaining proceeds from the sale of the vessel would exceed the amount of the maritime liens making a portion available to the crew without imposing the penalty on the lienors.
>
> The matter will, therefore, be referred to [the magistrate] to take evidence and report on the single issue of *whether the owner ... was solvent at the time of arrest* and now has available assets to satisfy the claim of [the mortgagee] and leave enough for a penalty on behalf of the wage claimants.

*Id*. (emphasis added).

And, *George v. Kramo Ltd.*, 796 F. Supp. 1541 (E.D. La. 1992), citing *Collie*, held the equitable owner of a vessel, which was the parent corporation of the legal owner and the seaman's employer, was *not* liable for penalty wages. *Id*. at 1545-47. *See also* SCHOENBAUM, ADMIRALTY AND MARITIME LAW, Vol. 1, § 6-4, at 248 (penalty wages statute places "obligations only on 'the master or owner' of a vessel, *not*

other parties who may be involved such as lenders" (emphasis added)).

Several other post-**Collie** cases have refused to impose penalty wages liability on a party other than the owner or master. In **Caldwell v. Solus Ocean Sys., Inc.**, 734 F.2d 1121 (5th Cir.), *cert. denied*, 469 U.S. 1019 (1984), cited by the district court, a seaman brought an *in personam* action against his employer to recover penalty wages. Our court held that, because the employer was neither the owner nor master of the vessel on which the seaman served, he could *not* recover penalty wages from the employer. **Id**. at 1121. To the same effect is **Sam v. Keystone Shipping Co.**, 913 F. Supp. 514 (S.D. Tex. 1996), in which a seaman filed an *in personam* action to recover penalty wages from his employer, which managed, for the vessel's owner, the vessel on which the seaman served. The court granted summary judgment for the employer, stating:

> By its plain language, the penalty wage statute imposes liability only upon the vessel's owner or master. It does *not* impose liability upon the master's employer or the injured seaman's employer.... Accordingly, the [sued employer], who is neither the master nor the owner of the vessel, as a matter of law cannot be liable for penalty wages pursuant to ... the plain language of the statute.

**Id**. at 515-16 (emphasis added). *Contra* **Smith v. Western Offshore, Inc.**, 590 F. Supp. 670, 674-77 (E.D. La. 1984) (seamen could *not* sue non-employer vessel owner *in personam* for wages, but were entitled to recover wages *and* penalty wages from their employer *in personam*).

29

In *Caparelli v. Proceeds of Freight*, 390 F. Supp. 1345 (S.D.N.Y. 1974), also cited by the district court, seamen asserted an *in rem* claim against freight proceeds and an *in personam* claim against the bank, which held a first preferred ship mortgage and was claimed to possess or control those proceeds; they also sought leave to amend their complaint to assert a penalty wages claim *against the bank*. *Id*. at 1347. In denying the requested amendment, the court stated:

> [The bank] was *not* a master or owner, but a mortgagee. Plaintiffs concede that they have found *no* case in which liability for double wages has been applied to a mortgagee. Since there appears *no* basis on which to hold [the bank], as holder of a first preferred mortgage on each of the vessels, liable for penalty wages ..., [the seamen's] motions to amend ... are denied.

*Id*. at 1351 (emphasis added).[9]

As noted, the seamen maintain that, for determining whether their penalty wages lien can be enforced against the proceeds, the district court should have focused on whether Golden Lines had sufficient cause for wages non-payment when due. In support, they

_____

[9]*See also* **Chung, Yong Il**, 774 F.2d at 1052 ("allowing a shipowner to avoid penalty wages liability through a contract would contravene the public policy implicit in the statute", which "speaks in terms of assessing penalty wages against only a vessel owner or a master"); **Parcel Tankers, Inc. v. M/T Stolt Luisa Pando**, 787 F. Supp. 614, 621 (E.D. La. 1992) (finding sufficient cause for alleged wrongful withholding, but stating that mortgagee was *not* liable for penalty wages because "[t]he statute places obligations on 'the master or owner'" (emphasis added)), *aff'd*, 990 F.2d 827 (5th Cir. 1993), *cert. denied*, 510 U.S. 1071 (1994).

rely on the Supreme Court's most recent case concerning the penalty wages statute, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982).

*Griffin* involved an *in personam* action by a seaman against the vessel owner, which was also his former employer.  The district court found the owner's refusal to pay earned wages was without sufficient cause, but imposed the wages penalty only for the period of nonpayment during which the seaman was unemployed.

The Supreme Court stated that the statute provided for payment of the wages penalty upon satisfaction of two conditions:

> First, the master or owner must have refused or failed to pay the seaman his wages within the periods specified.  Second, this failure or refusal must be "without sufficient cause."  Once these conditions are satisfied, however, the unadorned language of the statute dictates that the master or owner "*shall pay* to the seaman" the sums specified "*for each and every day* during which payment is delayed."

*Id*. at 570 (emphasis in original).  The Court thus concluded that district courts have *no* discretion to limit the period during which the penalty is assessed, and that its imposition is mandatory for each day of delay unless further delay is justified by sufficient cause.  *Id*. at 574-75 & n.9, 577.  Accordingly, the seaman recovered over $300,000 for the owner's delay in paying but $412.50 in wages. *Id*. at 574-75.

*Griffin* is *not* particularly helpful in resolving the issues in this case, because, unlike the present *in rem* action, it was an *in*

31

*personam* action against the vessel owner. Moreover, unlike the case at hand, it did *not* involve competing liens against sale proceeds insufficient to satisfy those liens.

Based on the facts at hand, and our exhaustive review of the statutes and related jurisprudence, the district court held correctly that the penalty wages statute's plain language precludes enforcement of the penalty wages liens at issue against the sale proceeds. The statute imposes liability for such wages only on the vessel *master or owner*. Its purpose is to coerce them to promptly pay seamen's wages. When, as here, sale proceeds are insufficient to satisfy all of the liens against the vessel, the owner has *no* interest in those proceeds. Therefore, because it has *no* interest, it has *no* proceeds against which the lien can be enforced. Concomitantly, the purpose of the statute is *not* furthered by enforcing a penalty wages lien against such sale proceeds.

To enforce the lien against proceeds in which the owner has *no* interest would be to act contrary to the plain language of the statute. As discussed, seamen, "wards of admiralty", have received favored treatment from Congress, and legislation enacted for their benefit is to be liberally construed in their favor. But, when interpreting legislation, we must always seek to give effect to the plain language chosen by Congress. *E.g., Griffin*, 458 U.S. at 570 ("[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language

32

must ordinarily be regarded as conclusive" (internal quotation marks and citation omitted)).

And, we also must assume that Congress knew what it was doing when it selected the objects for penalty wages liability. Lien law regarding seamen's wages had been established long before enactment of the first penalty wages statute in 1872. *E.g.*, **The Nestor**, 18 F. Cas. at 14. Accordingly, we must presume that Congress was aware of that well-settled law when it made the policy decision to make *only* the owner and master liable for such wages. *See* **Keene Corp. v. United States**, 508 U.S. 200, 212 (1993) (Congress is presumed to be aware of settled judicial interpretations). Had Congress desired to allow enforcement of penalty wages liens against vessel sale proceeds, *when neither the owner nor the master has an interest in those proceeds*, it easily could have said so. *E.g.*, **Humana, Inc. v. Forsyth**, 525 U.S. 299, 309 (1999).

## III.

For the foregoing reasons, the partial summary judgment is

*AFFIRMED.*

*DENNIS, Circuit Judge, dissenting.*

Because I believe that the district court erred in granting the Bank of Scotland's motion for partial summary judgment, I respectfully dissent.

On April 22, 1998 the seamen for the M/V MARIA filed suit in Louisiana state court against Golden Lines Shipping, Inc., the owner of the vessel, and Kosmas Marine Line, Inc., the manager of the vessel, for unpaid wages. The state court issued a writ of attachment and the M/V MARIA was seized by the sheriff on April 22. The Bank of Scotland, holder of a preferred mortgage lien on the M/V MARIA, also filed suit in April 1998 in federal court to foreclose its mortgage on the vessel. An arrest warrant issued by the district court was served on the vessel on April 29, 1998. The following month, Golden Lines Shipping and Kosmas Marine Line removed the seamen's suit to federal court. The two causes of action were consolidated and the seamen intervened in the federal action.

The Bank of Scotland subsequently purchased the vessel at an auction conducted by the United States Marshal for $3.7 million, an amount less than the outstanding debt secured by the mortgage. According to the Bank of Scotland, the seamen's maritime liens for

*back wages and penalty wages were subordinate to its mortgage lien and would not be paid because the sale proceeds were insufficient to satisfy the mortgage lien. Although the district court determined that the seamen's maritime liens were not subordinate to the Bank of Scotland's preferred mortgage lien, the district court also ruled that the maritime lien for penalty wages was not enforceable against the proceeds of the vessel sale because the owner had no interest in the vessel or the proceeds after the auction sale. The district court based its decision on the penalty wage statute which states, in pertinent part, that "[w]hen payment is not made as provided . . . without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed." 46 U.S.C. § 10313(g). Based on the language in the penalty wage statute, the district court refused to enforce the seamen's maritime lien against the sale proceeds because neither the master nor owner had an interest in the proceeds.*

*The seamen contend that they have a maritime lien which is superior to the Bank of Scotland's mortgage lien based upon the ship mortgage act. The ship mortgage act does not limit liability for maritime liens to a vessel's owner or master. Rather, it states that when a vessel is sold to enforce a preferred mortgage lien all claims in the vessel existing on the date of the sale are*

35

terminated. *See 46 U.S.C. § 31326(a).* These terminated claims "attach[], in the same amount and in accordance with their priorities to the proceeds of the sale", 46 U.S.C. § 31326(b), except that preferred maritime liens have priority over a preferred ship mortgage. Preferred maritime liens include "a maritime lien on a vessel . . . for wages of the crew of the vessel." 46 U.S.C. § 31301(5)(D). A penalty wage lien has the same priority as a wages lien. *See Collie v. Fergusson,* 281 U.S. 52, 54 (1930; *Peterson v. S.S. Wahcondah,* 331 F.2d 44, 48 (5th Cir. 1964).

In addition to the penalty wage statute, the district court cited two cases in determining that penalty wages should not be assessed against a party that is neither the owner nor the master of a vessel. Both cases are distinguishable from the facts of the present appeal. In *Caldwell v. Solus Ocean Systems, Inc.,* 734 F.2d 1121, 1122 (5th Cir. 1984), a Solus employee who worked on a vessel that Solus chartered brought suit against Solus pursuant to the penalty wage statute. The court determined that the penalty wage statute did not extend to an employer. *See id.* ("Because it is undisputed that Solus was not the master or the owner of the vessel on which Caldwell was employed, but was Caldwell's employer, the sole issue before us is whether section [10313] extends to 'employers' as well as those parties enumerated in the statute. We

36

*hold that it does not.").  Likewise, <u>Caparelli v. Proceeds of</u>*

*<u>Freight</u>, 390 F. Supp. 1345 (S.D.N.Y. 1974) did not state that*

*seamen were not entitled to assert their maritime lien for penalty*

*wages against the proceeds from the sale of a vessel.  The district*

*court refused to allow the seamen to amend their pleadings to state*

*a cause of action for penalty wages under 46 U.S.C. §596 [now*

*§10313] directly against a ship mortgagee because the statute does*

*not grant a cause of action against the holder of a mortgage on a*

*vessel, rather than a vessel owner or master.  <u>See id.</u> at 1351.*

*The majority opinion attempts to justify the result of the*

*district's court judgment on the ground that the seamen are limited*

*to a suit in personam to satisfy their maritime lien.  However, it*

*is well established that seamen may seek to satisfy their liens by*

*both in rem and personam proceedings:*

> *[M]ariners' wages, salvage, freight and bottomry are
> maritime causes of action [and] the court of admiralty has
> jurisdiction and may use any of its appointed modes to
> give the party any remedy to which the law entitles him.
> The substratum of the action is the liability of one party
> to respond to another and the court may enforce it against
> the person, or against a particular portion of his
> property, or against his property generally, as the law
> may have provided the right.  If the claim, which is the
> cause of action, be, by law, alien upon a vessel, her
> cargo, freight, the proceeds of the same, or the remnants
> and surplus thereof, the court may enforce that lien by a
> suit in rem, or, without reference to the lien may compel
> the party himself to pay the demand.  Remedies in rem and
> in personam may co-exist or one may be independent of the*

*other, e.g., a right of action in personam may be recognized where no lien is given by the maritime law.*

*2 BENEDICT ON ADMIRALTY § 25, at 2-18 (1999). Hence, the seamen are not limited to a suit in personam to satisfy their maritime lien. Whether the proceeding is in rem or in personam has no bearing in our determination of whether the seamen's maritime lien has priority over the Bank of Scotland's mortgage lien following the sale of the vessel.*

*Since the in rem/in personam distinction does not resolve the merits of this case, the court must analyze the terms of the penalty wage statute and the ship mortgage act. <u>Equilease Corp. v. M/V SAMPSON</u>, 793 F.2d 598 (5th Cir. 1986), discussed the history of the ship mortgage act. <u>Equilease Corp.</u> states, in pertinent part:*

> *The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away. The lien is a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds. Thus the maritime lien may be defined as a property right that adheres to the vessel wherever it may go. Such a lien has been held to follow the vessel even after it is sold to an innocent purchaser. The maritime lien is a lien on the vessel, "and only indirectly, inasmuch as it conflicts with the owner's rights in the vessel, it is connected with the owner." The maritime lien concept thus somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner . . . The Act provides a right to a federal maritime lien to*

"any person furnishing repairs, supplies, ... or any other necessaries, to any vessel ...." . . . Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged. These "things" may be money, labor and skill, and personal services as well as materials.

Id. at 602-03 (internal citations omitted). Thus, there is a distinction between the creation and the enforcement of a maritime lien. See also The Nestor, 18 F. Cas. 9, 14 (C.C.D. Me. 1831), which states, in pertinent part:

If seamen's wages were by the contract not payable until ten days after the voyage was completed, it would not disturb the lien on the ship for those wages. The lien has in all such cases an inchoate existence from the moment of the contract, and attaches sub modo on the ship. The lien for seamen's wages attaches ordinarily on the ship during the voyage, although no wages are strictly due until the end of the voyage. A sale of the ship, pending the voyage, would not defeat this inchoate lien; and when the voyage was completed, the lien would have relation back to the commencement of the voyage.

By furnishing their labor and personal services to the M/V MARIA, the seamen were entitled to a maritime lien which was created by operation of law when their wages were due and payable. This lien "follow[ed] the vessel even after it [was] sold to [the Bank of Scotland]. Based upon the plain language of the ship mortgage act, the seamen's penalty wage lien attached to the proceeds from the sale of the vessel as a preferred maritime lien with priority over the Bank of Scotland's preferred ship mortgage. See 46 U.S.C. § 31326(b)(1). Thus, the district court erred in ruling that the

*seamen's maritime lien for penalty wages was not enforceable against the proceeds of the vessel.*

*The seamen's maritime lien for penalty wages, in excess of $6.8 million, exceeds the lien for their unpaid wages of $260,618. In* *Griffin v. Oceanic Contractors, Inc.,* *458 U.S. 564 (1982), the petitioner was entitled to more than $300,000 in penalty wages as a result of the improper withholding of $412.50 by the vessel owner. The vessel owner argued that a literal interpretation of the penalty wage statute "would produce an absurd and unjust result which Congress could not have intended."* *Griffin, 458 U.S. at 574. The Supreme Court rejected this argument, stating that:*

> *In refusing to nullify statutes, however hard or unexpected the particular effect, this Court has said: "Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." . . . It is enough that Congress intended that the language it enacted would be applied as we have applied it. The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this Court . . . As we explained earlier, a condition to the imposition of the wage penalty is a finding that the delay in payment is "without sufficient cause." To the extent that the equities of the situation are to be considered, they bear on that finding, and not on the calculation of the penalty period once that finding has been made.*

*Id. at 575-77 (internal citations omitted).*

*In addition, neither the majority opinion nor the district court considered whether there was a genuine issue as to the material fact of the owner's insolvency when the unpaid wages began to accrue and the seamen's maritime lien attached to the owner's vessel. The seamen raised a genuine issue of material fact concerning the solvency of the vessel owner that should have permitted the case to go to trial.*

*A district court's decision to grant or deny summary judgment is reviewed de novo, applying the same criteria employed by the trial court in the first instance. See Burge v. Parish of St. Tammany, 187 F.3d 452, 464 (5th Cir. 1999). Summary judgment is proper when the pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, demonstrate that no genuine issue exists as to any material fact and that the movant is entitled to judgment or partial judgment as a matter of law. See Fed.R.Civ.P. 56(c); Burns v. Harris County Bail Bond Bd., 139 F.3d 513, 517-18 (5th Cir. 1998). We view all facts in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. See Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997). If the non-movant sets forth specific facts in support of allegations essential to her claim, a*

*genuine issue of material fact is presented and summary judgment is*
*inappropriate.  See id.*

*Seamen must be paid their wages within 24 hours after the cargo*
*has been discharged or within four days after the seamen have been*
*discharged.  See 46 U.S.C. § 10313(f).  If the seamen do not receive*
*their wages "without sufficient cause, the master or owner shall pay*
*to the [seamen] 2 days' wages for each day payment is delayed."  46*
*U.S.C. § 10313(g).  The Supreme Court discussed the requirements for*
*payment of delay wages in Griffin.  Two conditions must be satisfied*
*before seamen are entitled to delay wages:*

> *First, the master or owner must have refused or failed to*
> *pay the seaman his wages within the periods specified.*
> *Second, this failure or refusal must be "without*
> *sufficient cause."  Once these conditions are satisfied,*
> *however, the unadorned language of the statute dictates*
> *that the master or owner "shall pay to the seaman" the*
> *sums specified "for each and every day during which*
> *payment is delayed."  The words chosen by Congress, given*
> *their plain meaning, leave no room for the exercise of*
> *discretion either in deciding whether to exact payment or*
> *in choosing the period of days by which the payment is to*
> *be calculated.*

*Griffin, 458 U.S. at 570.*

*In determining the seamen's entitlement to delay wages, the*
*district court should not consider whether there was sufficient*
*cause for delay in payment after a suit has been filed.  Rather,*
*"liability for double wages accrues, if at all, from the end of the*
*period within which payment should have been made."  McCrea v.*

42

*United States*, 294 U.S. 23, 31-32 (1935).  The mere fact of late payment of wages does not entitle the seamen to delay wages, however.  If wages are not paid in a timely fashion "due to the insolvency of the owner and the arrest of the vessel", the owner has shown sufficient cause for nonpayment and is relieved of statutory liability for delay wages.  *Collie v. Fergusson*, 281 U.S. 52, 56 (1930).

The district court had evidence that the seamen were not paid in a timely fashion and that the owner did not have sufficient cause for nonpayment of wages when the wages were owed.  The seamen introduced evidence that they were not paid wages on two occasions, March 24, 1997 and April 20, 1998.  They also produced audited financial statements for the M/V MARIA stating that the vessel's profit in 1997 was $113,000.  Based upon these financial statements, the seamen argue that the owner was not insolvent on March 24, 1997 when they should have received their wages.  The Bank of Scotland arrested the M/V MARIA on April 29, 1998 to foreclose on its mortgage.  Thus, the evidence indicates that on March 24, 1997, one of the dates when wages were owed to the seamen, the owner of the vessel was not insolvent and the M/V MARIA had not been arrested.  At that time, the seamen's maritime lien attached and the owner had an interest in the vessel.  The owner failed to show sufficient

*cause for nonpayment and has not been relieved of statutory liability for delay wages according to Collie.*

*The district court failed to analyze the requirements for payment of delay wages and mistakenly considered the insolvency of the vessel owner at the time of the sale as being crucial, not when the maritime lien attached upon the penalty wages becoming due and payable to the seamen. Based upon these shortcomings, I would REVERSE the judgment of the district court and remand the case for a trial on the disputed material issues of fact.*