TCW SPECIAL CREDITS,
Plaintiff–Appellant,

v.

CHLOE Z FISHING COMPANY,
INC., Defendant,

v.

Juan BARANDIARAN; Alfred Canepa; Vjekoslav Gobin; Jerko Kurtin; Milarad Beader; Dani Blaslov; Boris Gobin; Ivica Gobin; Stiven Gobin; Damir Koncurat; Zoran Kurtin; Oliver Svorcina; Nejdelko Vitlov; Ernes Gobin; Dragan Blaslov; Dragan Longin; Niksa Zlencic, Plaintiffs–Intervenors–Appellees.

No. 97–15726.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1997.

Decided Dec. 5, 1997.

James M. Harris, Sidley & Austin, Los Angeles, CA, Craig Miller, Davis Wright Tremaine, Seattle, WA, for plaintiff-appellant.

Kurt Micklow, Rice, Fowler, Booth & Banning, San Diego, CA, for plaintiffs-intervenors-appellees.

Philip A. Berns, Stephen G. Flynn, Torts Branch, U.S. Dept. of Justice, San Francisco, CA, for amicus curiae.

Before: REINHARDT, LEAVY and THOMAS, Circuit Judges.

LEAVY, Senior Circuit Judge.

In this action, the holder of a preferred ship mortgage caused a tuna fishing boat to be arrested and sold. Former crewmen then intervened to assert damage claims for unpaid wages, arguing that because no written employment agreement had been provided, they were entitled under federal statutory law to be paid at the same rate as the captain of the vessel. The district court entered summary judgment in favor of the wage claimants, and the mortgagee has appealed. We reverse and remand.[1]

## FACTS AND PRIOR PROCEEDINGS

The F/V CHLOE Z is an American-flagged tuna purse seine boat[2] that operates out of ports in the Western Pacific Ocean. The CHLOE Z was formerly owned and operated by the Chloe Z Fishing Company, Inc. ("CZFC"), a single-asset Northern Mariana Islands corporation.

The CHLOE Z generally carried a crew of seventeen, consisting of a fish captain, chief engineer, navigator (master), assistant engineer, helicopter pilot, deck boss, cook, skiff driver, speed boat driver, and eight deck hands (e.g., oilers and net stackers). Typical of the industry, individual crew members of the CHLOE Z were paid a rate, known in the industry as a "lay share," in lieu of wages. A crewman's rate of compensation is determined by his rank, job classification, duties and ability. The rate is then multiplied by the adjusted tonnage[3] of fish caught. The rate typically ranges from a low of $5 per adjusted ton for an ordinary seaman to a high of $40 per adjusted ton for the fish captain.

In June 1995, TCW Special Credits ("TCW"), a California general partnership, acquired CZFC's preferred ship mortgage on the CHLOE Z. By the following summer, CZFC was in serious financial straits: it had not paid the crew of the CHLOE Z for either of the last two voyages, and was behind in its mortgage payments to TCW. On July 5, 1996, TCW filed an action *in personam* against CZFC and *in rem* against the CHLOE Z in the District Court of Guam. The vessel was arrested and sold at a Marshal's auction. The proceeds of the sale were deposited in the court's registry.

Twenty-one[4] former crewmen of the CHLOE Z filed a complaint in intervention in TCW's action, asserting *in personam* claims against CZFC and *in rem* claims against the CHLOE Z for unpaid wages. The complainants alleged that the defendants had not only failed to pay them their agreed upon wages, but had also failed to provide the former crewmen with written contracts of employment, and this latter failure entitled the complainants to "penalty wages" at the rate the captain was paid. The district court agreed with the former crewmen and granted their motion for summary judgment.

1. By separate order we dismissed for want of appellate jurisdiction the related appeal in *TCW Special Credits v. Chloe Z Fishing Co., Inc.*, No. 97–15725.

2. A purse seine is a large net between 250 and 400 yards in length and some 18 to 20 yards in depth. The top of the net is supported by floats, while the bottom is weighted with brass rings through which a purse line passes. The net is first drawn around a school of fish, creating a huge circle open at both the top and bottom. Once the two ends of the net have been linked, the bottom ends of the net are drawn together, creating a giant basket. *See Webster's New International Dictionary* 2018 (2d ed.1960).

3. "Adjusted tonnage" is the gross tonnage of fish caught and offloaded, adjusted for species and size, less cannery rejects.

4. We note—without attempting to resolve—the parties' dispute over the correct number of appellees. TCW argues that there are thirteen appellees, because eight of the original twenty-one complainants settled and assigned their claims to TCW. Opposing counsel insist that there are nineteen appellees, because six of the settlements were invalid and unenforceable.

TCW has timely appealed from that decision.[5]

## ANALYSIS

### *Discussion*

■ The gist of the appellees' claim for damages is that CZFC violated 46 U.S.C. § 10601 by failing to provide the crewmen of the CHLOE Z with written fishing agreements, and this violation entitles them to recover damages on their unpaid wage claims in the form of penalty wages equal to the lay share due the CHLOE Z's fish captain. While we accept the first half of this argument, we must reject the second half.

Unlike merchant seamen, who have long enjoyed the special protection of courts and Congress, American fishermen (other than those employed in the cod and mackerel fishing industries) have not been the subject of much federal legislative concern throughout most of our nation's history.[6] This state of affairs changed, however, with the recent passage of the Commercial Fishing Industry Vessel Safety Act of 1988 (the "Act"), Pub.L. No. 100–424, 102 Stat. 1585 (Sept. 9, 1988) (codified at various places throughout Title 46 and 46 Appendix, United States Code).

Prior to 1988, American fishermen not engaged in the cod and mackerel fisheries did not ordinarily sign shipping articles, but entered into fishing employment agreements that were generally informal and often oral. Section 6(a) of the Act, codified at 46 U.S.C. §§ 10601—10603, was designed to change this practice:

(a) Before proceeding on a voyage, the master or individual in charge of a fishing vessel ... shall make an [sic] fishing agreement in writing with each seaman employed on board if the vessel is-

(1) at least 20 gross tons ...; and

(2) on a voyage from a port in the United States.

(b) The agreement shall be signed also by the owner of the vessel.

(c) The agreement shall-

(1) state the period of effectiveness of the agreement;

(2) include the terms of any wage, share, or other compensation arrangement peculiar to the fishery in which the vessel will be engaged during the period of the agreement; and

(3) include other agreed terms.

46 U.S.C. § 10601 (in relevant part).[7] "When fish caught under an agreement under section 10601 ... are delivered to the owner of the vessel for processing and are sold, the vessel is liable in rem for the wages

---

**5.** TCW appealed rather than CZFC and/or the CHLOE Z because the effect of the district court's ruling was to establish a larger than anticipated wage lien enforceable against the proceeds of the vessel's sale, thereby reducing the amount of money available to TCW as the preferred mortgagee. *See United States v. ZP Chandon,* 889 F.2d 233, 237 (9th Cir.1989) (claim for unpaid seamen's wages gives rise to maritime lien having priority over preferred ship mortgage lien).

**6.** See, e.g., former 46 U.S.C. § 604 (*repealed by* Pub.L. No. 98–89, § 4(b), 97 Stat. 500, 600 (1983)), which expressly denied to crewmen on fishing vessels the right to proceed *in rem* on a libel for unpaid wages.

**7.** Section 10601's predecessor statute, former 46 U.S.C. § 531, read as follows:

The master of any vessel ... carrying on the bank and other cod fisheries, or the mackerel fishery ... shall, before proceeding on such fishing voyage, make an agreement in writing with every fisherman who may be employed therein[.] ... Such agreement shall be in-

dorsed or countersigned by the owner of such fishing vessel or his agent.

46 U.S.C. § 531 (*repealed by* Pub.L. No. 100–424, § 6(c), 102 Stat. 1585, 1592 (1988)).

Section 531 was part of Chapter 17, "Regulation of Fishing Voyages," and was separate from Chapter 18, "Merchant Seamen," of Title 46. Moreover, section 531 was itself the codification of R.S. 4391 (1878), which was derived from two nineteenth century statutes designed to protect cod and mackerel fishermen, not seamen: the Acts of June 19, 1813 (ch. 2, § 1, 3 Stat. 2) and of March 3, 1865 (ch. 117, 13 Stat. 535).

While section 531 maintained the historically recognized distinction under maritime law between fishermen and seamen, section 10601 does not. For example, section 10601 identifies fishermen as "seamen" and was inserted into Subtitle II, Part G ("Merchant Seaman Protection and Relief") of Title 46, rather than segregated into a separate fisheries chapter, like section 531. *See also* 46 U.S.C. § 10101(3) (" 'seaman' means an individual ... engaged or employed in any capacity on board a vessel.").

and shares of the proceeds of the seamen." 46 U.S.C. § 10602(a).

█ Fishermen hired without articles, contrary to the provisions of section 10601, may avail themselves of the protection afforded seamen by 46 U.S.C. § 11107. *Seattle–First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1198 (9th Cir.1996); *Bjornsson v. U.S. Dominator, Inc.*, 863 P.2d 235, 238–40 (Alaska 1993). That statute provides:

> An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

46 U.S.C. § 11107.

The appellees contend that section 11107 is unambiguous and allows a wronged seaman to recover penalty wages equal to those of the highest paid seaman—regardless of rating—at the port of hire, *e.g.*, the fish captain. TCW argues that section 11107 is ambiguous, and that a review of the statute's history and prior case law shows that a wronged seaman is entitled to recover wages equal to the higher of either his orally agreed upon wages or those wages a seaman of equal rating could command at the same port of hire. The United States as *amicus curiae* insists that, while the statute is not ambiguous, it must be interpreted in the light of its predecessor and related statutes, none of which would support the reading advanced by the appellees.

We note at the outset at least three problems with the position advanced by the appellees. First, the phrase, "highest rate of wages at the port" fails to identify *whose* "highest rate of wages" is to be used as the benchmark. Should it be the wages earned by the highest paid person at the port, *e.g.*, the CEO of a multinational corporation headquartered there? Should it be the wages earned by the highest paid person employed on a vessel at the port, *e.g.*, the captain of a luxury cruise liner? Should it be the wages earned by the highest paid person connected with the CHLOE Z, *e.g.*, the CHLOE Z's fish captain?

Second, adopting the appellees' interpretation would have the effect of rendering superfluous the words, "rate of wages." While seamen have ratings (e.g., ordinary, able bodied, etc.), and are paid flat wages based thereon, most non-seamen are simply paid wages, and not a "rate of wages" which is the rate, based on a seaman's rating, to be applied to the adjusted tonnage of fish caught on the voyage.[8]

Third, adopting the appellees' interpretation would also have the effect of rendering superfluous the statute's final phrase, "whichever is higher." If "highest rate of wages at the port" means "highest rate of wages at the port paid to any seaman, regardless of his job description," that rate would, by its very definition, always be as high as or higher than "the amount agreed to be given the seaman at the time of engagement."

In light of the above, it would appear that the only logical and internally consistent reading of the statute is the one urged by both TCW and the United States: a wronged seaman is entitled to recover the higher of either the wages he orally agreed to, or the highest rate of wages that could be earned by a seaman at the port of hire *who has the same rating* as the complainant.

An examination of the history of 46 U.S.C. § 11107 supports this interpretation. Section 11107 is the 1983 reenactment and recodification of former 46 U.S.C. § 578. That statute read,

> All shipments of seamen made contrary to the provisions of any act of Congress shall be void; and any seaman so shipped may leave the service at any time, and shall be entitled to recover the highest rate of wages of the port from which the seaman was shipped, or the sum agreed to be given him at his shipment.

46 U.S.C. § 578 (*repealed by* Pub.L. No. 98–89, § 4(b), 97 Stat. 500, 600 (1983)).

---

8. Hence the traditional maritime distinction between officers (e.g., the master, first mate, etc.) and *ratings* or seamen (i.e., those below the rank of officer). A failure to acknowledge this point leads to the absurdity of the master of the CHLOE Z (i.e., the fish captain) violating federal law by failing to have himself sign a fishing agreement with himself. *See* 46 U.S.C. § 10601(a).

Section 578 was itself the 1928 codification of R.S. 4523 (1878), which was in turn a revised (1872) version of ch. 48, 5 Stat. 394, known as the Act of July 20, 1840. The language of the 1840 Act was almost identical to that of its successor statutes:

> All shipments of seamen, made contrary to the provisions of this and other acts of Congress, shall be void; and any seamen so shipped may leave the service at any time, and demand the highest rate of wages paid to any seaman shipped for the voyage, or the sum agreed to be given him at his shipment.

5 Stat. at 395. *See also the Lily,* 69 F.2d 898, 898–99 (9th Cir.1934) (tracing the history of related statutes).

Cases construing the predecessor statutes of 46 U.S.C. § 11107 consistently held that a seaman's "highest rate of wages" was to be measured against seamen with the same rating or similar duties. *See, e.g., Lent Traffic Co. v. Gould,* 2 F.2d 554, 556–57 (3d Cir.1924) (river pilot); *the Elihu Thompson,* 139 F. 89, 93 (W.D.Wash.1905) (ordinary seamen); *the Pacific,* 23 F. 154, 155 (W.D.Pa.1885) (deckhand). Cases construing similar statutes reached the same results. *See, e.g., the James H. Shrigley,* 50 F. 287, 288 (N.D.N.Y. 1892) (interpreting R.S. 4520 and 4521,[9] applicable to coastwise seamen, as requiring comparable wages for wife of cook as "second cook"); *the Australia,* 2 F.Cas. 236, 237–38 (D.Me.1859) (No. 667) (interpreting predecessor of R.S. 4521 as requiring "highest wages" for a cook). Finally, cases applying general maritime law principles also reached the same results. *See, e.g., the Topsy,* 44 F. 631, 633 (D.S.C.1890) (seaman without articles paid quantum meruit and allowed to leave vessel); *the Acorn,* 15 F. 751, 752 (W.D.Pa. 1883) (mariners to be paid "at the rate paid by other like vessels leaving the same port at the same time on the like voyage"); *Rollins v. E O Stanard,* 4 F. 750, 751 (E.D.Mo.1880) (mariner entitled to compensation at rate for same "class[ ] of service"; i.e., $5 more per month than that paid to "roustabouts").

In light of the above, we conclude that section 11107 is properly construed as having the following effect. It (1) renders void an oral contract entered into in violation of section 10601; (2) permits the wronged seaman to leave the service of the vessel without being declared a deserter; and (3) entitles the wronged seaman to recover either his promised wages or the highest rate of wages of a seaman of comparable rating at the port from which he was engaged, whichever is higher. Accordingly, the decision of the district court must be reversed and the case remanded for a determination of the amounts due the various complainants. *See supra* note 4.

REVERSED and REMANDED for further proceedings.

---

**9.** Those statutes were subsequently codified at 46 U.S.C. §§ 574 and 575, respectively. Sections 574 and 575 were repealed by Pub.L. No. 98–89, § 4(b), 97 Stat. 600, 602 (1983), and now appear, in relevant part, at 46 U.S.C. §§ 10502(a) and 10508(a), (b).