TCW SPECIAL CREDITS, a California General Partnership, as Agent and Nominee, Plaintiff/Appellant,

v.

F/V KASSANDRA Z, OFFICIAL NO. 653391, HER ENGINES, NETS, FURNITURE, etc., In Rem KASSANDRA FISHING COMPANY, INC.; a Commonwealth of the Northern Mariana Islands corporation, In Personam, Defendants.

_____

MICHAEL DATIN, et al., Plaintiffs-In-Intervention/Appellees,

v.

M/V KASSANDRA Z, OFFICIAL NO. 654491, HER ENGINES, NETS, FURNITURE, etc., In Rem, et al., Defendants.

_____

AND RELATED CLAIMS

High Court of American Samoa
Appellate Division

AP No. 05-00,
AP No. 09-00

March 4, 2003

Before RICHMOND, Associate Justice; WALLACE,[*] Acting Associate Justice; MOLLWAY,[**] Acting Associate Justice; MAMEA, Associate Judge; TUPUIVAO, Associate Judge.

Counsel: Craig Miller and Barry I. Rose for Plaintiff/Appellant TCW Special Credits
William H. Reardon and William L. Banning for
Michael Datin, et al., Plaintiffs-In-Intervention/Appellees

OPINION AND ORDER

TCW Special Credits ("TCW") appeals from a judgment of the Trial Division holding that following its foreclosure of a preferred ship mortgage on the *F/V Kassandra Z (Kassandra Z)*, TCW must pay Michael Datin, et al., *Kassandra Z's* crew, statutory wages under 46 U.S.C. § 11107 and *quantum meruit* damages because the chip's former owner failed to do so prior to the arrest of the ship in 1996. The crew also appealed and cross-appealed. The Trial Division had jurisdiction over this action pursuant to A.S.C.A. § 3.0208(a). We have jurisdiction

---

[*] The Honorable J. Clifford Wallace, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation of the Secretary of the Interior.
[**] The Honorable Susan Oki Mollway, District Judge, United States District Court for the District of Hawaii, sitting by designation of the Secretary of the Interior.

over these timely appeals pursuant to A.S.C.A. § 3.0208(c). We affirm in part, reverse in part, and remand to the Trial Division for further proceedings.

## I.

The *Kassandra Z* was part of a family of eleven tuna seiners owned by the Zuanich family who operated out of various ports, including American Samoa, Guam, New Zealand, and San Diego, California. The Zuanich family began to experience financial difficulty in 1995. Seeking relief, the Kassandra Z Fishing Co., Inc., one of the companies owned by the Zuanich family, granted a preferred ship mortgage to TCW secured against its vessel, the Kassandra Z. On July 2, 1996, TCW filed a foreclosure action against the *Kassandra Z* in the Trial Division and had the vessel arrested by the High Court Marshal. The crew members on board were removed from the ship, and most were repatriated to their homeland in Croatia.

Thereafter, the crew members intervened in the foreclosure action, alleging that they were owed unpaid wages for two full voyages, as well as "short checks"—adjustments in pay based on the cannery's final calculation of the haul to be canned—left unpaid from other trips. Because the crew members were never given written fishing agreements as required by 46 U.S.C. § 10601 they asserted they were entitled to statutory wages under 46 U.S.C. § 11107. Section 11107 provides that "[a]n engagement of a seaman contrary to a law of the United States is void. A seaman so engaged . . . is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher." 46 U.S.C. § 11107.

Following a three-day trial the Trial Division awarded judgment for the crew in the amount of $713,623.14. The Court determined the amount of the award based upon unpaid wages under Section 11107 for two trips, wages for the time the crew spent waiting in port for what was to be the final voyage of the ship, prejudgment interest, and other costs. Both sides moved for reconsideration of portions of the Trial Division's decision, and the Court issued a second order, holding that Section 11107 wages for the short checks were available, and adjusting the crew's award to $1,396,155.55.

On appeal, TCW argues that the wages awarded to the crew under 46 U.S.C. § 11107 are really "penalties" that cannot be recovered *in rem* with priority over TCW's preferred ship mortgage. It also argues that the Trial Division erred in awarding wages under Section 11107 for the "short checks" that were never paid. TCW alleges that the Trial Division erred in allowing the crew to prove the rate of wages to which they were

entitled under Section 11101 by a "prima facie" showing only. Finally, it asserts that the Trial Division erred in awarding any wages for the crew's in-port waiting time for the final journey that never happened. The crew argues on cross-appeal that the court erred in requiring the crew to prove any comparability under Section 11107. They assert that instead they should receive the highest wage paid to "any seaman" on board the ship. In the alternative, they suggest that the Trial Division should have used a rating system as suggested by the Court of Appeals for the Ninth Circuit in *TCW Special Credits v. Chloe Z Fishing Co.*, 129 F.3d 1330 (9th Cir. 1997).

## II.

One preliminary matter deserves attention. Long after briefing had closed and just weeks before oral argument, the crew filed what it styled a "supplemental brief," which urged that under the unpublished decision in *TCW Special Credits v. Barandiaran*, 238 F.3d 431 (Table), 2000 WL 1277939 (9th Cir. Sept. 8, 2000), the Trial Division additionally erred in ruling that the *Kassandra Z*'s Master and Fish Captain were not entitled to wages under Section 11107. The Court of Appeals for the Ninth Circuit does not ordinarily allow citation to unpublished decisions. Ninth Circuit Rule 36-3(b). The crew does not provide a reason why we should consider a decision the authoring court does not deem to be of precedential authority.

However, we need not decide this issue. We conclude the crew's claim in its "supplemental brief" is jurisdictionally barred. While parties may direct our attention to legal authority established subsequent to briefing, they are not free to raise new arguments not addressed in their briefs. The crew did not raise this issue in either their appellee's brief or their cross-appeal brief. Therefore, the "supplemental brief" does not meet the ten-day time limitation for filing a notice to appeal, A.C.R. 4(a). Because the deadline for filing a notice of appeal is jurisdictional, A.S.C.A. § 43.0802(b), *Taulaga v. Patea*, 17 A.S.R.2d 34, 35 (App. Div. 1990), we will not address this issue.

## III.

We review questions of law *de novo*. *Anderson v Vaivao*, 21 A.S.R.2d 95, 98 (App. Div. 1992). We may not set aside the findings of fact of the Trial Division unless they are clearly erroneous. A.S.C.A. § 43.0801(b); *Anderson*, 21 A.S.R.2d at 98. A finding is clearly erroneous when "the entire record produces the definite and firm conviction that the court below committed a mistake," according particular weight to the trial judge's assessment of conflicting and ambiguous facts." *E.W. Truck & Equip. Co. v. Coulter*, 20 A.S.R.2d 88, 92 (App. Div. 1992).

With this in mind, we turn first to whether the Trial Division erred in concluding that the statutory wages it awarded the crew for unpaid trips under 46 U.S.C. § 11107 were recoverable *in rem* against the *Kassandra Z* and with a preferred lien status over TCW's ship mortgage.

■ TCW urges us to call these statutory wages "penalties" or "punitive damages," and asserts that we should hold that they are not recoverable *in rem* with priority over TCW's preferred ship mortgage. TCW correctly points out that the purpose of the portion of statutory wages awarded under Section 11107 that is more than what the seaman would have received had his fishing agreement been valid is designed to punish ship owners who illegally engage seamen. *Seattle-First Nat'l Bank v. St. Elias Ocean Prods., Inc.*, 98 F.3d 1195, 1198 (9th Cir. 1996). Historically, the purpose of the requirement of a written shipping articles agreement was to protect seamen from exploitation and mistreatment, *Sylvis v. Rouge Steel Co.*, 873 F.2d 122, 125 (6th Cir. 1989), while its modern purpose is to avoid disputes about wages and other terms and conditions of employment precisely like the one in this lawsuit. *Id.* As such, the "punishment" for violation of this requirement is that the ship is answerable to the crew for a rate that may be higher than what they invalidly agreed to in the first place.

■ We understand that punitive damages cannot be recovered against a vessel. *Hunley v. Ace Mar. Corp.*, 927 F.2d 493, 496 (9th Cir. 1991). Nonetheless, statutory wages awarded under Section 11107 are not punitive damages. The statute expressly states that the seaman illegally engaged "is entitled to recover the *highest rate of wages* at the port from which the seaman was engaged or the amount agreed . . . whichever is higher." 46 U.S.C. § 11107 (emphasis added). The statute therefore substitutes for the oral agreement, and calls for the rate of wages that are to be paid. Thus, the amount awarded under Section 11107 is not a "punitive damages" award—it rather represents wages owed at a rate statutorily set. Courts have long held this to be the case. *See West Winds, Inc. v. M.V. Resolute*, 720 F.2d 1097, 1103 n.4 (9th Cir. 1993) (citing to predecessor statutes discussed in *Collie v. Fergusson*, 281 U.S. 52, 54 (1930) and *Gerber v. Spencer*, 278 F. 886, 889 (9th Cir. 1922)); *Buckley v. Oceanic S.S. Co.*, 5 F.2d 545, 546 (9th Cir. 1925) (predecessor statute).

■ Statutory wages awarded under 46 U.S.C. § 11107 give rise to preferred maritime liens that are recoverable *in rem*. 46 U.S.C. § 31301(5)(D); *Seattle-First Nat'l Bank v. Conaway*, 95 F.3d 1195, 1198-99 (9th Cir. 1995). This is so because, as the Supreme Court recognized early in American history, a ship is liable *in rem* for the unpaid wages of a Seaman. *The John G. Stevens*, 170 U.S. 113, 119 (1898). Moreover, seamen's wage liens have always been granted the highest priority after *in custodia legis* costs. *Key Bank of Wash. v. S. Comfort*, 106 F.3d 1441,

8

1443-44 (9th Cir. 1997); *Kesselring v. F/T Arctic Hero*, 30 F.3d 1123, 1125-26 (9th Cir. 1994). The Ship Mortgage Act also makes clear that liens for wages of the crew have priority over preferred ship mortgages. 46 U.S.C. § 31326(b)(1).

■ TCW urges us to adopt the holding of the Fifth Circuit in *Governor & Co. of Bank of Scotland v. Sabay*, 211 F.3d 261, 275 (5th Cir. 2000), and apply it here. *Sabay* held that penalty wages awarded under 46 U.S.C. § 10313(g) are not recoverable *in rem* against the sale proceeds of a fishing vessel. *Id.* at 275. However, the plain language of Section 10313(g), with which *Sabay* dealt, makes the holding in that case inapplicable to the case before us. Section 10313(g) states that when the master does not pay each seaman the balance of wages due "without sufficient cause, the *master or owner shall pay* to the seaman 2 days' wages for each day payment is delayed." 45 U.S.C. § 10313(g) (emphasis added). The Fifth Circuit interpreted this statute's plain language to "preclude . . . enforcement of the penalty wages liens at issue against the sale proceeds. The statute imposes liability for such wages only on the vessel *master or owner. Sabay*, 211 F.3d at 275. Because the sale proceeds were insufficient to satisfy all of the liens against the vessel, the owner no longer had an interest in those proceeds; therefore the lien could not be enforced against proceeds in which the owner no longer had an interest. *Id.* at 275-76. *Sabay* is inapplicable to this case, where Section 11107 has no language limiting recovery only as against the vessel's master or owner.

■ TCW's final argument is that it is an "innocent lienholder" and shouldn't have to pay the crew's wages under Section 11107. But when TCW secured its mortgage on the *Kassandra Z*, the statutes at issue in this case, 46 U.S.C. § 10601 and 45 U.S.C. § 11107, were already law. Commercial Wishing Industry Vessel Safety Act of 1988, Pub. L. 100-424, § 6(a), 102 Stat. 1591 (codified as 46 U.S.C. § 10601); Act of Aug. 25, 1983, Pub. L. 99-89, 97 Stat. 580 (codified as 46 U.S.C. § 11107). The relevant cases, *West Winds*, 720 F.2d at 1103 n.4 (holding that Section 11107 wages are wages and not punitive damages) and *The John G. Stevens*. 170 U.S. at 119 (holding that "as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages") had long been decided. When TCW secured the mortgage on the *Kassandra Z,* it should have been aware of what the law was, even if, as it asserts, it was standard practice in the fishing industry to operate without written fishing agreements. Indeed, compared to fishermen, mortgagees like TCW are in a better position to demand that vessel owners make written agreements with their seamen through covenants in the mortgage contract.

We therefore hold that the Trial Division did not err in awarding the statutory wages to the crew under Section 11107's preferred status over

TCW's ship mortgage.

## IV.

We next deal with TCW's challenge to the Trial Division's decision to award approximately $600,000 under 46 U.S.C. § 11107 for unpaid wages owed on certain "short checks" unpaid at the time of the vessel's arrest. It is standard practice in the tuna fishing industry to pay crew wages in two installments: the first is a substantial payment of 90-95% of the wages owed based on the estimated weight of the fish off-loaded; the second is for the remaining 5-10%, known as a "short check," which is calculated after the cannery determines the quantity of "rejects." Short checks typically are issued within a few weeks after the catch is off-loaded; however, the owners of the *Kassandra Z* never paid crew members their short checks for nine of the twenty-six fishing trips they made. TCW argues that the Trial Division erred in awarding statutory wages for these missing short checks. TCW's argument is based upon three contentions: (1) the seamen were "fully paid" for the nine trips in question; (2) permitting the recovery of statutory wages would be unfair and would cause dire consequences to the fishing industry; and (3) the crew's claims are barred by the equitable doctrine of laches.

As for TCW's first contention, the Trial Division found that the crew members were not fully paid for these trips. We hold the finding was not clearly erroneous. That they received the first payment of 90-95% does not mean they were "fully paid."

The "unfairness" argument, based upon the crew recovering more wages than they would have had their fishing agreements been valid, is addressed to the wrong forum. We cannot change what is clear on the face of the statute. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *Griffin v Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982). The statutory-language here is unambiguous: statutory wages are awarded any time there is an unlawful engagement of a seaman. 46 U.S.C. § 11107. Operation of Section 11107 is automatic because it renders "engagement of a seaman contrary to the law of the United States . . . void." *Id*. As the Trial Division observed, "A void contract is a legal nullity, and cannot serve as the basis for equitable estoppel. In the event that the oral agreements between the [c]rew and [the Kassandra Z Fishing Company] were void, partial payment on their terms does not constitute a bar to the recovery of statutory wages under 46 U.S.C. § 11107." *TCW Special Credits, Inc. v F/V Kassandra Z*, 4 A.S.R.3d 154, 164-65 (Trial Div. 2000). The crew members are entitled to statutory wages for those trips, regardless of whether they had already been paid a majority of their wages. The result of the Trial Division considering the old trips for which the crew admittedly was mostly paid is a consequence of the plain language of the statute. Such seemingly harsh consequences

are precisely directed by the statute at forcing compliance with Section 10601. Thus, TCW should direct this argument to Congress.

■■ TCW's third assertion is that the crew's claims for statutory wages on these prior trips are barred by laches. Laches is an equitable doctrine that bars an action where there has been an unreasonable delay in bringing the suit, and the other party has been prejudiced as a result of the delay. *Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 533 (1956); *Sandvik v. Alaska Packers Ass'n*, 609 F.2d 969, 971 (9th Cir. 1979). Given a proper use, claims involving old trips already mostly paid for might cause application of the doctrine of lathes to mitigate the harsh consequences of the automatic operation of Section 11107. But TCW only argues that if any of the crew members had raised their claims for wages under Section 11107 earlier, the issue would have been resolved right away. But with no record support, it would be difficult to conclude that such claims would have been resolved with any speed, given the fact that the owners of the *Kassandra Z* had repeatedly failed to pay the crew what they were owed under the invalid oral agreements. Furthermore, TCW has not made an express claim of undue delay or prejudice, nor has it made a record of any prompt payment. The best that TCW has been able to suggest is that if the crew members had raised their Section 11107 claims before the foreclosure action, perhaps the vessel's owners would have paid them. This is an allegation, not proof, and there is no basis upon which we could hold that the action of the crew members as to these nine trips is barred by laches.

## V.

■■■ TCW next challenges the "light burden" of proof to which the Trial Division held the crew when it came to determining the amount of wages to which the crew was entitled for its unpaid voyages and short checks under Section 11107. The Trial Division decided that the crew need only make what it called a "prima facie" showing that an individual seaman was comparable to another seaman who made a higher wage at the port where the seamen were employed. The Court borrowed the comparability requirement from the Court of Appeals for the Ninth Circuit's holding in *Chloe Z*, 129 F.3d at 133, that "a wronged seaman is entitled to recover the higher of either the wages he orally agreed to, or the higher rate of wages that could be earned by a seaman at the port of hire *who has the same rating* as the complainant." "Rating" refers to the seaman's "rank, job classification, duties and ability." *Id.* at 1331. We hold that *Chloe Z* properly states the rule. In most cases, it requires that seamen seeking statutory wages under Section 11107 prove that the wage rate they claim is a rate derived from the salary of a seaman with the same rank, job classification, duties and ability. However, these considerations are not exclusive. We examine the totality of the circumstances in determining whether a seaman has demonstrated that he

11

or she is comparable to another seaman for purposes of Section 11107. The Trial Division accepted a "prima facie" showing as making out the crew's claim of comparability.

■ To prevail in a civil action, a party must make the required showing by a preponderance of the evidence. *Tuia Suasuai v. Salave`a*, 3 A.S.R.2d 1 (Lands & Titles Div. 1986). Here we are called upon to determine whether the Trial Division erred when it allowed crew members to demonstrate the applicable wage rate by merely submitting rosters. Those rosters listed various crewmen with job labels such as "deckhand" or "seaman" and the corresponding person with the same label who was earning the most money elsewhere in the Zuanich fleet. However, the Trial Division made extensive findings of fact that the wage rate for ordinary deckhands in the Zuanich fleet was determined largely by intangible factors such as loyalty to a captain or even nepotism, rather than factors such as rank, job classification, duties or ability. TCW has not proven these findings to be clearly erroneous, and therefore, the findings must be accepted. The Court's findings of fact suggest that deckhands were not generally comparable because their wages depended not on identifiable factors like rank, job classification, duties or ability, but rather on intangibles such as personality or relationship to the Fish Captain. As the Court found:

> There are indeed significant distinctions in the rate of wages offered deckhands, not only from one ship to another, but even on a single trip of a single vessel. Certainly the reasons for these differences were based at least in part on issues such as ability and seniority. . . . At the same time, the facts established at trial also demonstrate that most deckhands performed substantially the same day-to-day tasks, including stacking nets and cork, standing watch, sorting fish, painting, and other such duties not requiring any particular expertise or training . . . . The method of hiring replacement deckhands is particularly illustrative of the interchangeable nature of these workers . . . . [Fish Captain Gojko] Milisic would simply put in a call to have someone flown out from Croatia, or would hire any available seaman off the docks, regardless of whether the deckhand to be replaced happened to have served in a specialized role such as spotting fish or driving the skiff . . . . [I]n his words, the deckhands were "[j]ust . . . laborer[s]" and needed "no license, no skill." . . . . While we find that experience and abilities may have played a small role in [determining wages], as discussed above, the evidence indicates that the more critical contributing factors were significantly less tangible. For example, Fish Captain Milisic testified that, among other things, he might pay one seaman more than another because "I like the guy" or because he's not

"a trouble maker" . . . Total experience as a seaman might be marginally relevant to wages, but loyalty *to a particular captain* appears to be much more significant.

*TCW Special Credits, Inc. v. F/V Kassandra Z*, 163 3 A.S.R.3d 163, 170-71 (Trial Div. 1999).

Because TCW has provided us no basis upon which to conclude that this finding dealing with ordinary deckhands aboard the *Kassandra Z* is clearly erroneous, there is no basis for requiring proof in addition to the rosters of the crew. We affirm the Trial Division's decision with respect to those deckhand crew members because the Trial Division made specific findings of fact that the *Chloe* factors of rank, job classification, duties and ability played only a small role in determining the deckhands' wages.

We now turn to the other members of the crew. The Trial Division constructed its overall "prima facie" case mechanism after considering the purpose of Section 11107 and the historical position of seamen in the fishing industry. The Trial Division placed a "light burden" on the crew for proving comparability based upon concerns about the ability of seamen to search out and identify someone from their port who has the same duties and skills as he, and the seaman's traditional role as a "ward . . . of admiralty." *TCW*, 3 A.S.R.3d at 171. The Trial Division concluded that requiring complicated methods of proof would thwart the primary purpose of Section 21107: to provide "a quick and efficient means by which wronged seamen can get the wages owed to them." *Id.* Instead, the Court decided it would be better to place the heavier burden of rebutting prima facie comparability on the vessel's owner, who would have better access to the personnel in his fleet. *Id.* at 172. In addition, the Court pointed out that burdens of production and proof in admiralty claims are generally relatively minimal. *Id.* at 171 (citing *Comeaux v, T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir. 1983) (seaman's burden of proving cause in Jones Act cases is "featherweight"); *Yelverton v. Mobile Labs, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) ("A seaman's burden of production in establishing the value of his maintenance is feather light.")).

Nonetheless, we disagree with the Trial Division that crew members in this case, other than ordinary deckhands, are entitled to recover the wage of the highest paid Zuanich fleet employee with the same job label such as "assistant engineer" or "fish captain" based on crew rosters alone. These terms are too general; the Trial Division made no finding of fact that such generalities were reflective of the actual computation of these crew members' wages. To the contrary, the Court stated "[t]here appears to be little debate that for the most established positions aboard a tuna boat captain, engineers, helicopter pilots, deck boss, cook, etc.),

these factors [rank, job classification, duties and ability] will, by definition, all be [capable of comparison] from boat to boat and from fleet to fleet." *TCW*, 3 A.S.R.3d at 169. Therefore, the Court's determination that "each member of the [c]rew is [equal] to his counterparts throughout the Zuanich fleet, within the meaning of the Ninth Circuit's decision in *Chloe Z*," *id.* at 173, is clearly erroneous in light of the crew's burden of proving its case by a preponderance of the evidence and the lack of facts that would support the finding that crew members, other than ordinary deckhands, were "interchangeable" without reference to their rank, job classification, duties and abilities. Instead, it would have been helpful, for example, if these crew members had correlated themselves to someone in the fleet with the same rank, job classification, duties and ability (whether contained in his job description or not). This is not too much of a burden on these crew members in light of the monetary import of entitlement to statutory wages under Section 11107.

On cross-appeal, the crew members argue for a literal reading of the statute and a conclusion that they are entitled to whatever the highest wage rate is at the port at issue, regardless of what kind of job that person holds. Section 11101 is ambiguous as to exactly whose wages at the port in question should be used as a substitute for the seaman engaged without fishing articles. It says "the highest rate of wages at the port from which the seaman was engaged or the amount agreed . . . whichever is higher." The crew's reading, however, is patently absurd, as the phrase "whichever is higher" would have no meaning: someone at the port (e.g., the chief executive officer of a shipping company, etc.) will always have a wage higher than the one a crew member was promised as a seaman. In any event such a holding is foreclosed by *Chloe Z*, 125 F.3d 1333.

Therefore, we reverse the Trial Division's ruling other than the deckhands, that the crew's *prima facie* showing of comparability proved their case by a preponderance of the evidence.

## VI.

Finally, TCW argues that the Trial Division erred in awarding the crew wages for the time they spent waiting in port for what was to be the *Kassandra Z*'s final voyage before the ship's arrest. The Trial Division awarded fourteen crew members wages for the period of November 21, 1996 through July 2, 1996, the time between the end of the 215th trip and the time the *Kassandra Z* was arrested. The Trial Division awarded wages based on the doctrine of *quantum meruit*, which awards a plaintiff an amount equal to the value of the benefit he has provided to protect against the unjust enrichment of the beneficiary. RESTATEMENT (SECOND) OF CONTRACTS § 370 (1981).

14

■ TCW argues that tuna fishermen are not ordinarily paid wages for in-port wait time, and that there was little or no work performed by the crew during this period. Whether fishermen are ordinarily paid wages for time spent waiting in port is irrelevant to the question whether the crew can recover in *quantum meruit* for the value of the benefit they conferred upon the *Kassandra Z* and its owners. Moreover, the Trial Division found that "the [c]rew was indeed active in maintaining the vessel and preparing it for its next fishing voyage." *TCW*, 3 A.S.R.3d at 179. The Trial Division found that the crew was instrumental in keeping the vessel in working order, which was valuable even if the imminent voyage never materialized because it maintained a higher price upon judicial sale of the vessel than would have been realized if the vessel were run-down. This finding is not clearly erroneous, and thus we hold that it was not error for the Trial Division to award recovery in *quantum meruit* for in-port waiting time.

■ We next turn to the method the Court used in calculating the *quantum meruit* damages owed to the crew. The Court multiplied 43 days (the number spent waiting) by an "average daily catch" (as if the crew had been fishing), which it found to he 14427 tons; and multiplied this amount (619.93 tons) by the rate it determined to be the highest rate of wages paid to a comparable "seaman." *Id.* at 185. This calculation cannot be correct because *quantum meruit* is an award based on the actual value of the benefit conferred, not the hypothetical benefit that might have accrued (catching a certain tonnage of fish) had the ship taken a last voyage. Furthermore, the statutory wage provision of Section 11107 (highest rate of wages at the port of engagement) cannot come into play in the calculation of an award for benefits conferred during the in-port waiting time. Section 10601 (whose violation results in an award of statutory wages under Section 11107) provides that a written fishing agreement shall be made "before proceeding on a voyage." 46 U.S.C. § 10601. The *Kassandra Z* did not "proceed on a voyage" after Trip 26 (the last before the ship was arrested), so Section 10601 could not have been violated, nor Section 11107 implicated. We therefore reverse the Trial Division's decision regarding the method of calculating the *quantum meruit* award, with direction to find facts and make a calculation of the benefit conferred upon the *Kassandra Z* by the crew's efforts in those 43 days.

■ TCW argues that even if *quantum meruit* recovery is warranted, it cannot be awarded *in rem* against the sale proceeds of the ship. However, American Samoa law allows *in rem* recovery against a vessel of a *quantum meruit* award. *Zuguin v. M/V Captain M.J. Souza*, 23 A.S.R.2d 7, 10 (Trial Div. 1992). *Zuguin* permitted a helicopter pilot engaged to prepare a ship for a voyage to recover in *quantum meruit* in an *in rem* proceeding against the vessel where the mechanic had quit

prior to the planned voyage. *Id.* at 10-11. We therefore hold that the Trial Division may allow *in rem* recovery of the *quantum meruit* award.

## VII.

In summary, we affirm the Trial Division's award of wages under Section 11107 for ordinary deckhands, the grant of priority to these wages over TCW's preferred ship mortgage, and the allowance *in rem* award of *quantum meruit* damages for services performed while the *Kassandra Z was* in harbor.

We reverse the Trial Division's decision allowing the crew, other than the ordinary deckhands, to prove comparability by *prima facie* showing only, and its method of calculating the *quantum meruit* recovery owed to the crew for in-port waiting time.

We remand for the Court to conduct such further hearings as the Trial Division wishes in keeping with our decision. No costs.

It is so ordered.